**COUNTY OF ST. LOUIS, County of Lake, and County of Cook; National Association of Canoe Liveries and Outfitters; Conservationists with Common Sense; Ely Outfitters Association; Grant Marais–Gunflint Trail Outfitters Association; and Harvey G. Solberg,**

v.

**Jack Ward THOMAS, as Chief of the United States Forest Service, and Daniel Glickman, as Secretary of Agriculture,**

and

**Wilderness Inquiry, Inc.; Friends of the Boundary Waters Wilderness; Wildness Watch; and Sawbill Trail Outfitters Association.**

**FRIENDS OF THE BOUNDARY WATERS WILDERNESS; Wilderness Watch; Sawbill Outfitters, Inc.; The Izaak Walton League of America, Inc.; The Wilderness Society; and Wilderness Inquiry, Inc.,**

v.

**Jack Ward THOMAS, as Chief of the United States Forest Service, and Daniel Glickman, as Secretary of Agriculture.**

Nos. 5–94–CV–154, 5–95–CV–10.

United States District Court,
D. Minnesota,
Fifth Division.

June 16, 1997.

372

Richard A. Duncan, Brian Boru O'Neill, Elizabeth Hendricks Schmiesing, Faegre & Benson, Minneapolis, MN, for Friends of the Boundary Waters Wilderness, Wilderness Watch, Izaak Walton League of America, The Wilderness Society, Wilderness Inquiry, Inc., Sawbill Trail Outfitters Association.

Friedrich Anson Paul Siekert, U.S. Attorney's Office, Minneapolis, MN, Michelle L. Gilbert, General Litigation, U.S. Department of Justice, Denver, CO, for Jack Ward Thomas, Richard Rominger, Michael Espy.

David Russell Oberstar, Fryberger Buchanan Smith & Frederick, Duluth, MN, for County of St. Louis, County of Lake, National Association of Canoe Liveries and Outfitters, Conservationists with Common Sense, Ely Outfitters Association, Grand Marais Gunflint Trail Outfitters Association, Harvey G. Solberg, Cook County.

## ORDER

ROSENBAUM, District Judge.

In August, 1993, the United States Forest Service and the Department of Agriculture (defendants herein) adopted a plan to impose visitor use restrictions in the Boundary Waters Canoe Area ("BWCA"). These restrictions, which reduce the number of individuals entering the BWCA, underlie the present dispute.

This proceeding arises from two consolidated lawsuits. In the first action, plaintiffs are counties in which major portions of the BWCA are located, along with a number of canoe outfitters who service BWCA visitors ("Outfitter Plaintiffs"). These plaintiffs claim the newly imposed restrictions unduly limit access to the BWCA, in violation of the Boundary Waters Canoe Area Wilderness Act ("BWCAW Act"), the National Forest Management Act ("NFMA"), the Americans with Disabilities Act ("ADA"), and the Administrative Procedure Act ("APA"). In the second lawsuit, plaintiffs are wilderness conservation groups ("Conservation Plaintiffs") who claim the restrictions permit excessive motorized use in the BWCA, in violation of the BWCAW Act and the APA. Defendants, in each suit, argue the restrictions are neither arbitrary nor capricious and comply with all congressional mandates.

All parties have submitted briefs seeking summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R.Civ.P."). Each party agrees there are no disputed facts and that these cases are ripe for summary resolution.

## I. *Background*

### A. *BWCA and Wilderness Legislation*

The BWCA is a wilderness area, comprising more than one million acres in the Superior National Forest. Within its borders are several thousand portage-linked lakes, interspersed with islands, forests, and crags. The BWCA is the most heavily visited wilderness area within the United States Forest Service's National Preservation System.

In 1964, Congress passed the Wilderness Act, designating the BWCA as a wilderness area within the Act's protection. 16 U.S.C. § 1131. The Wilderness Act, among other things, generally banned motorized uses, including motorboats, in wilderness areas. The Act, however, explicitly provided for continued motorized use in the BWCA. *Id.* § 1133(c) and (d)(5). The provision allowing for continued motorized use in the BWCA has generated substantial controversy.

To help resolve this controversy, Congress, in 1978, passed the BWCA Wilderness Act ("BWCAW Act") Pub.L. No. 95–495, 92 Stat. 1649 (1978); *see Minnesota by Alexander v. Block,* 660 F.2d 1240, 1246 (8th Cir.1981) (stating the BWCAW Act was passed "in response to the confusion and litigation generated by the [motorized use] proviso [in the Wilderness Act]"). The BWCAW Act, among other things, directs the Secretary of Agriculture ("the Secretary") to develop and implement quotas for motorboats on the lakes where motorized use was permitted, Pub.L. No. 95–495, § 4(f), and to administer the area in accordance with wilderness area laws.

The BWCAW Act's direction to the Secretary to develop and implement motorized use quotas is at the heart of the present controversy. That provision states, in relevant part:

> The Secretary is directed to develop and implement. entry point quotas for use of motorboats within the wilderness portions of the lakes listed [in this Act], the quota levels to be based on such criteria as the size and configuration of each lake, and the amount of use on that lake.... *Provided further,* That on each lake homeowners and their guests and resort owners and their guests on that particular lake shall have access to that particular lake and their entry shall not be counted in determining such use.

*Id.* (emphasis in original)

### B. *Adoption of the 1993 Plan*

In 1986, the United States Forest Service adopted a Land and Resource Management Plan ("Forest Plan") for the entire three million-acre Superior National Forest. The Friends of the Boundary Waters and The Wilderness Society, members of the Conservation Plaintiff group in this action, filed an administrative appeal of the Forest Plan. That earlier appeal addressed, among other issues, visitor use and impact in the BWCA.

The parties to the Forest Plan appeal settled that matter. As part of the settlement, the Forest Service agreed to study visitor use in the BWCA and develop a plan to counter the effects of high visitor use on the wilderness. To this end, the Forest Service formed an advisory task force, which drafted the BWCA Wilderness Management Plan and Implementation Schedule ("the Plan"). On August 19, 1993, the Forest Service signed the Record of Decision implementing the Plan.

It is this Plan which is before the Court. Relevant to the Conservation Plaintiffs' challenge, the Plan exempts towboats from day use motor quotas. The Plan also treats certain lake chains as single lakes for purposes of administering the Act's homeowner and resort owner motor quota exemption.

Relevant to the Outfitter Plaintiffs' challenge, the Plan reduces maximum party sizes from ten to nine individuals, and limits each party to four watercraft. The Plan reduces the percentage of campsites available for occupancy in designated travel zones and eliminates about 200 campsites. The Plan also reduces overall visitor entry point quotas, day use motor permits, and overnight motor permits. The Plan eliminates "overbooking," a practice by which the Service issued more permits than there were available slots. These additional permits had been designed to account for those potential visitors who secure, but ultimately do not use, issued per-

mits. Under the Plan, the Service simply issues a fixed number of permits; those that are unused are lost. In addition, the Plan reduces BWCA maintenance, eliminates canoe rests, and requires removal and storage of motors by visitors leaving motorized zones. Finally, the Plan defines "guest" as one who stays overnight at a host's home or commercial lodging, for purposes of section 4(f) of the BWCAW Act.

## II. *Discussion*

### A. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The Court finds this matter is ripe for summary decision.

### B. *Standard of Review Under the APA*

The Plan, a final decision of the Forest Service, is reviewed pursuant to the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706. Under the APA, a court accords great deference to agency determinations and may overturn agency actions only if they are "arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); 5 U.S.C. § 706(2)(A). If an agency's determination is supportable on any rational basis, a court must uphold it. *Production Credit Ass'n v. Farm Credit Admin.*, 783 F.Supp. 416, 417 (D.Minn.1991); *see also Bowman Transp., Inc. v. Arkansas–Best Freight Sys.,*

*Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (stating that courts must not attempt to "substitute their judgment for that of the agency").

An agency determination, however, is not sacrosanct. When reviewing agency action, a court must carefully inquire into the facts and consider whether the action was based on all relevant factors. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). An action is considered arbitrary and capricious if the agency's explanation in support "runs counter to the evidence before the agency." *Defenders of Wildlife v. Administrator, Envtl. Protection Agency*, 688 F.Supp. 1334, 1348 (D.Minn.1988) (Murphy, J.), *aff'd in part, rev'd in part on other grounds*, 882 F.2d 1294 (8th Cir.1989).

### C. *Outfitter Plaintiffs' Claims*

#### 1. *Definition of "Guest"*

Under the BWCAW Act, guests of lakeshore property owners are exempt from entry point quotas for motor use on designated lakes. Pub.L. No. 95–495, § 4(f). The Act, however, does not define "guest". In the absence of a statutory definition, defendants have drafted regulations to effectuate the BWCAW · Act's mandate. In the Plan, "guest" is defined as "a person receiving overnight lodging ... with the consent of a keeper or owner." BWCAW Plan at F–5. The Outfitter Plaintiffs argue this definition violates the BWCAW Act and the APA because it ignores the ordinary meaning of "guest" by unduly restricting the term to overnight lodgers.

The Outfitter Plaintiffs argue, in essence, that the plain meaning of "guest" encompasses anyone who stops at a resort.[1] Their

---

1. In this action, the Outfitter Plaintiffs also challenged the definition of "guest" as it applies to homeowners. This issue, however, has generally been resolved through federally sponsored mediation between environmental groups and proponents of motorized access to the BWCA. The parties to the mediation agreed upon the following recommendation regarding guests of BWCA homeowners:

Each home on a BWCAW portal lake where motors are permitted will be issued a yearly

guest pass which could be used by a day-only visitor to that home to access that lake without applying for a regular day-use motor permit. No money or other compensation may change hands for this privilege.

This recommendation, agreed to at the parties' final mediation session on April 28, 1997, will be forwarded to Minnesota's congressional delegation.

This having been noted, the Court observes *that no party has appeared in this matter who*

argument is unpersuasive. If followed to its logical conclusion, the Outfitter Plaintiffs' definition would eviscerate the BWCAW Act's manifest intention to impose reasonable limits on lake access, while assuring that commercial operators in the BWCA remain relatively unencumbered in their use of the area.

The Outfitter Plaintiffs' proffered definition, for example, would encompass visitors who simply stop at a resort for a candy bar, gum, fuel, or bait. Under the Outfitter's definition, the party making this transient stop and ephemeral visit would be exempt from the Plan's permit requirements. Clearly, under the Outfitter Plaintiffs' proposed definition, limitless numbers of visitors would be exempt from the permit requirements. This would effectively negate the entry quotas called for under the BWCAW Act. This cannot have been Congress's intent. The overall thrust of the BWCAW Act supports defendants' definition. Accordingly, the Court upholds the Plan's overnight restriction as applied to commercial enterprises.

### 2. *Visitor Use Limitations*

■ The Plan imposes a number of measures to reduce visitor use. These include elimination of campsites and reductions in the percentage of campsites that may be occupied in certain travel zones. Restrictions are placed on party sizes and overall visitor entry point quotas. The plan reduces day use and overnight motor quotas and eliminates "overbooking." The Outfitter Plaintiffs contend defendants failed to consider the consequences of these actions and failed to support their decisions with sufficient evidence. Defendants counter, and the Court agrees, that the record supports its decisions on each issue.

In examining the factors underlying defendants' decisions, the Court must examine the decision's overall effect and may not view each factor in isolation. *See Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1511 (9th Cir.1992). Here, defendants contend

their decision to limit visitor use in the BWCA was based on such factors as campsite deterioration, visitor dissatisfaction with encountering other visitors, overall increases in visitor use, projected travel patterns, and average daily demand for use permits. Although any one of these factors may be insufficient to require an overall reduction in visitor use in the BWCA, when taken as a whole, these factors adequately support defendants' action.

For example, the Outfitter Plaintiffs argue that reducing visitor use will not stem deterioration of existing campsites. This may be true; the Final Environmental Impact Statement regarding the Plan notes visitor use reductions will "have little overall effect" on campsite preservation. Administrative Record at 2345. Campsite preservation, however, is not an impermissible factor merely because, standing alone, it is inadequate to support defendants' decision. The administrative record provides additional Plan support when it notes that, although reducing visitor use will not singlehandedly protect or restore BWCA campsites, reduced visitor use will have an incremental effect on campsite preservation. *Id.*

■ The Outfitter Plaintiffs' attacks on the defendants' data sources used to support the Plan are similarly insubstantial. For example, the Outfitter Plaintiffs criticize the travel zone model defendants used to project travel patterns. This model, however, was developed over nearly two decades and includes extensive studies based on travel diaries, as well as expert opinion and a computer model. The Outfitter Plaintiffs' challenge to these evaluation techniques is not well taken. The law is clear that a court may not "second-guess methodological choices made by an agency in its area of expertise." *Inland Empire Pub. Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993). The Court declines the Outfitter Plaintiffs' invitation to do so.

claims to be an individual lake property homeowner living in the BWCA. As a result, the Court questions, but explicitly declines to decide, whether any of the present parties has Article III standing to question the adequacy of the "guest"

definition as it relates to individual lake homeowners. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2135–37, 119 L.Ed.2d 351 (1992).

Similarly, this Court may not substitute its own judgment for the agency's when determining the best method to control BWCA visitor use. *See Bowman Transp., Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447. This determination falls well within the ambit of the agency's expertise. In this regard, the Outfitter Plaintiffs contend defendants violated the BWCAW Act by unduly reducing daily entry and overnight motor permits. Defendants reduced these permit quotas based on their calculation of average daily demand for permits during the five-month period from May to September. The Outfitter Plaintiffs, understandably, would prefer a different adjustment to the Plan because average daily demand for permits in May and September is less than the demand in July and August. The defendants' Plan cuts visitor use—and with it the demand for the Outfitters' services—during the summer months.

Nevertheless, the Outfit Plaintiffs, argument for the Plan's modification fails. The Court finds no defensible reading of the BWCAW Act that requires defendants to allow unrestricted access to the BWCA during peak travel seasons. Further, the Court rejects the Outfitter Plaintiffs' contention that the permit reductions lack support in the record. Congress directed defendants to take actions to preserve the BWCA as a wilderness. Pub.L. No. 95–495. Pursuant to this direction, defendants examined visitor use patterns, campsite conditions, and visitors' opinions concerning visitor encounters. Using this material, defendants determined they needed to diminish visitor use. Although the Outfitter Plaintiffs may proffer, and prefer, a different solution to the concerns of BWCA overuse, the Court cannot say the defendants' solution is unreasonable or without support. As such, the Court finds defendants' actions reducing visitor use in the BWCA were neither arbitrary nor capricious.

### 3. *Alleged Violations of the ADA*

■ The Outfitter Plaintiffs claim certain provisions of the Plan violate the ADA, 42 U.S.C. § 12101 *et seq.,* by making the BWCA less accessible to disabled persons. This claim is unavailing. The Outfitter Plaintiffs

may not pursue this claim because the ADA does not provide a cause of action against the federal government. *See* 42 U.S.C. § 12131(1)(A)-(B) (defining public entities covered by the ADA as any state or local government). Because the ADA does not contain an explicit, unequivocal waiver of sovereign immunity, and because "such a waiver cannot be implied," the Outfitter Plaintiffs' ADA claim must be dismissed. *See United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502–03, 23 L.Ed.2d 52 (1969).

■ The Outfitter Plaintiffs argue, in the alternative, that the Plan violates the BWCAW Act's direction to the Forest Service to "provid[e] opportunities for a wide range of outdoor experiences for disabled persons." Pub.L. No. 95–495, § 18(d). This claim also fails. The Forest Service has already responded to the BWCAW Act's directives. In 1981, the Service adopted a plan to provide accessible campsites, barrier-free recreation sites, and educational programs concerning these sites. Administrative Record at 510. The 1993 Plan does not alter or diminish these long-standing programs.

The Outfitter Plaintiffs contend that, although the Plan continues the Forest Service's long-established accessibility programs, it impermissibly limits disabled visitors' access to the BWCA. They argue that by reducing maintenance of portage trails, eliminating canoe rests, and requiring that motors be removed from boats leaving a motorized zone, defendants have improperly terminated practices that once allowed disabled persons even greater access to the BWCA.

The Court is not persuaded. Section 18(d) explicitly directs the Secretary to develop programs for disabled persons that are "consistent with the purposes of the Act." One such purpose is to "protect and enhance the natural values and environmental quality" of the BWCA wilderness area. *See* Pub.L. No. 95–495, § 2. Consistent with this purpose, defendants have adopted a plan that reduces access to the BWCA for all visitors, regardless of the physical abilities of any particular visitor. Disabled persons are no more affected by the Plan's visitor restrictions than are any others. As such, the Court finds no violation of section 18(d) of the BWCAW Act.

### 4. *Alleged NEPA Violations*

■ In their final claim, the Outfitter Plaintiffs allege defendants have violated the National Environmental Policy Act ("NEPA"). *See* 42 U.S.C. § 4332(2). Defendants respond that the Outfitter Plaintiffs lack standing to assert this claim. The Court agrees.

To establish Article III standing, the Outfitter Plaintiffs must show (1) they have suffered an injury in fact, (2) which can fairly be traced to the conduct complained of, and (3) is likely to be redressed by a favorable decision. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136–37. They must, in addition, satisfy the APA's requirement that persons *"adversely affected or aggrieved by agency* action within the meaning of a relevant statute" may bring suit to challenge a final agency action. 5 U.S.C. § 702 (emphasis added). Accordingly, under the APA, the Outfitter Plaintiffs must show the challenged agency action resulted in injury to an interest arguably within the "zone of interests" protected by the statute at issue. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 893, 110 S.Ct. 3177, 3190–91, 111 L.Ed.2d 695 (1990); *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972).

Here, the Outfitter Plaintiffs seek redress, under NEPA, for economic losses. NEPA, however, provides no relief for economic injury. Under NEPA, federal agencies must prepare an Environmental Impact Statement before taking actions that will "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA imposes this requirement to ensure protection of the physical environment. *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 772, 103 S.Ct. 1556, 1560, 75 L.Ed.2d 534 (1983) ("NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment—the world around us, so to speak."); *see also Churchill Truck Lines, Inc. v. United States,* 533 F.2d 411, 416 (8th Cir.1976). Because the Outfitter Plaintiffs raise no environmental concerns as part of their NEPA claim, the Court finds their asserted interests lie beyond the zone of interests protected by the

statute. *See Nevada Land Action Ass'n v. United States Forest Serv.,* 8 F.3d 713, 716 (9th Cir.1993).

### D. *Conservation Plaintiffs' Claims*

The Conservation Plaintiffs raise two claims, both of which center on defendants' interpretation of section 4(f) of the BWCAW Act.

### 1. *Towboat Exemption*

■ Under the Plan, commercial motorized towboats receive special use permits. The permits are limited in number "to the 1992 levels for numbers of boats, trips, commercial operators, and specific lakes." BWCAW Plan at 3–14. The Conservation Plaintiffs claim this exemption violates the BWCAW Act, the Wilderness Act, and the APA. They contend that both the BWCAW Act and the Wilderness Act require towboat operators to obtain day use permits, which must be counted against the day use motor permit quotas for the lakes on which the towboats operate.

The Conservation Plaintiffs, ultimately, argue that section 4(f) of the BWCAW Act mandates a unitary motorboat quota system. The Court disagrees. By its own words, section 4(f) directs the Secretary to develop and implement "entry point *quotas* for use of motorboats within the [BWCA] ." Pub.L. No. 95–495, § 4(f) (emphasis added) The use of the plural term "quotas" shows that Congress did not intend that the Secretary impose a single quota for all motorized craft. The Court finds the plural term "quotas" signals Congress's willingness to allow a multiple quota system.

The Conservation Plaintiffs attempt to bolster their argument by pointing to section 4(c) of the BWCAW Act, which exempts towboats from the motorboat horsepower limitations set forth therein. Pub.L. No. 95–495, § 4(c)(1). They contend this provision suggests Congress's awareness of towboats and the Congress's concomitant ability to provide exemptions for towboats where warranted. This argument is not persuasive. The above provision simply demonstrates Congress's recognition that towboats, which pull the weight of multiple watercraft in addition to

their own, may require greater horsepower than recreational motorboats. Neither the letter of the words contained in section 4(c) nor the section's spirit signals Congress's direction of a particular, and singular, means by which to calculate towboat motor use quotas.

In the Plan, defendants developed a dual system that accommodates day use motor permits and special permits for towboats. These quotas, even taken together, do not exceed the BWCAW Act's overall motor quotas. Defendants claim this system allows effective management of visitor use and protects the wilderness, while fulfilling the requirements of the BWCAW and the Wilderness Acts. The Court finds defendants' assertion is well supported: the adopted Plan is neither arbitrary nor capricious. As such, the Court upholds the towboat exemption from day use motor permit requirements.

### 2. Chain of Lakes

■■■ Under section 4(f) of the BWCAW Act, "homeowners and their guests and resort owners and their guests on that particular lake shall have access to that particular lake," regardless of entry quotas. Defendants, in implementing this provision, treat the Moose, Sucker, Newfound, and Birch Lakes as one lake, and the White Iron, Farm, Garden, and South Farm Lakes as one lake. The Seagull River and Gull Lake are treated as part of Saganaga Lake. The Conservation Plaintiffs claim defendants' treatment of these lake chains as a "particular lake," for purposes of administering the guest provision, violates the BWCAW Act by impermissibly expanding motorized use on the lakes at issue. The Court does not agree.

Defendants' treatment of these lake chains simply maintains the Forest Service's longstanding and unbroken practice, in place since the BWCAW Act was passed in 1978. Defendants assert this treatment is proper and rational, because these lake chain systems are interconnected and require no portaging. As such, persons using the chains "as a practical matter [can] travel throughout each chain without regard to the name of the particular lake they [are] on." See Administrative Record at A–6.

The Court observes, first, that defendants' construction of this provision of the BWCAW Act has been in effect for a number of years, and Congress has not acted to change it. As such, this construction is entitled to exceptional deference. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

Further, the Court concurs in defendants' contention that the BWCAW Act does not preclude treating these lake chains as one lake for purposes of administering the guest provision. Congress, in enacting the BWCAW Act, permitted continued motorized use in areas where motorboats were historically used. S.Rep. No. 1327. The lake chains at issue have been historically used by property owners and their guests. As such, the Court finds defendants' treatment of these lake chains is an historically consistent and reasonable interpretation of the BWCAW Act.

Finally, the Court finds reasonable defendants' determination that, as a practical matter, the lake chains at issue are navigable as a single lake. The Court, accompanied by counsel for each of the parties, visited the BWCA and inspected the Moose Lake chain, consisting of Moose, Sucker, Newfound, and Birch Lakes. The Court also inspected the BWCA's Lake One and Lake Two, and viewed the portage connection to Lake Three. The observed distinction between the Moose Lake chain and Lakes One, Two, and Three is instructive.

Although the Moose Lake chain features obvious narrowings between portions of a continuous body of water, the narrowed portions cannot be considered as channels, and they are certainly not portages. The connection between Lakes One and Two, by contrast, is a narrow channel, perhaps 40 feet wide depending on water levels. This channel meanders for several hundred yards until it opens onto the neighboring lake. The passage between Lakes Two and Three is simply a portage across a tiny, independent body of water.

From this viewing, it appears reasonable to the Court to treat the lake chains at issue

as single lakes. As the Court observed, the Moose Lake chain is a single body of water, with spatial variations defined by narrowings in the lake. Lakes One, Two, and Three, by contrast, comprise a series of geographically separate, distinct bodies of water with clearly defined, extended passages between them. Based on the historical precedent for the treatment of these lake chains, and on its own observations, the Court finds defendants' decision regarding these lake chains neither arbitrary nor capricious.

III. *Conclusion*

Based on the files, records, and proceedings herein, and for the reasons set forth above, IT IS ORDERED that:

1. The Conservation Plaintiffs' motion for summary judgment is denied.

2. The Outfitter Plaintiffs' motion for summary judgment is denied.

3. Defendants' motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.