ARIZONA CATTLE GROWERS'
ASSOCIATION, et al.,
Plaintiffs,

v.

Charles W. CARTWRIGHT,
Jr., et al., Defendants.

No. Civ 97–1868PHX RCB.

United States District Court,
D. Arizona.

Sept. 29, 1998.

**1102**

Norman D. James, Jay L. Shapiro, Ryley Carlock & Applewhite, P.A., Phoenix, AZ, for plaintiffs.

Andrew A. Smith, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for defendants.

Stephen G. Udall, Apache County Attorney, St. Johns, Arizona, for amicus curiae, Apache County.

## ORDER

BROOMFIELD, Chief Judge.

Plaintiffs bring this cause of action, challenging the United States Forest Service's decision to amend its forest management plan to enact region-wide grazing management standards, pursuant to the Administrative Procedure Act ("APA"). Currently pending before the court are Defendants' Motion to Dismiss, or in the Alternative for Summary Judgment, Plaintiffs' Motion for Summary Judgment, and non-party Apache–County's Motion for Leave to File Declaration as Amicus–Curiae. The court heard oral argument on Defendants' and Plaintiffs' motions on June 15, 1998, at which time it took the motions under advisement. After considering the arguments of the parties and for the reasons stated below, the court will deny Plaintiffs' motion and grant Defendants' motion.

## BACKGROUND

This action stems from regulatory action taken by the United States Forest Service ("USFS") to protect the Mexican spotted owl and Northern Goshawk. On June 5, 1996 USFS adopted region-wide standards and guidelines for grazing ungulates in the Southwestern Region. The then-Regional Forester for the southwestern Region of the USFS, Charles W. Cartwright, Jr., made the initial decision to adopt the amended guidelines, and his decision was affirmed on appeal to the Chief of the USFS, Mike Dombeck.[1] Plaintiffs now challenge these guidelines and the USFS decision to adopt this amendment as arbitrary and capricious.[2]

The guidelines resulted from a complex planning process governed by the National

---

1. Both Cartwright and Dombeck are named as Defendants in this litigation.

2. Plaintiffs, Arizona Cattle Growers' Association, Page Land & Cattle Co., and Brian and Debora Jennings, are individuals involved in the business of cattle grazing.

Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Forest Service's own regulations. Under NFMA, the Secretary of Agriculture is required to develop Land and Resource Management Plans ("LRMP") and to revise and amend such plans as needed. At issue is an amendment enacted in the Southwestern Region of the National Forest System, consisting of national forest territory throughout Arizona and New Mexico. In June of 1996, the Forest Service amended the existing LRMP for the Southwestern region following a lengthy five year amendment process.

The goal of the amended forest plans was to "incorporate sound management guidance primarily for the benefit of two species of concern, the Mexican spotted owl and the northern goshawk, but [the plans] encompassed several other Region-wide objectives as well." Defendant's Motion to Dismiss, 1:9–12.[3] The applicable Acts and regulations require certain actions to insure that USFS meets its stated goals as closely as possible, and to insure that it considers possible adverse results and other alternatives.

Accordingly, USFS drafted notices describing planned regulations, allowed public comment on such notices, developed prospective alternatives, developed several planning documents, and drafted an "Environmental Impact Statement" ("EIS") describing its goals, projected plans, and possible alternatives. Many of these documents and pronouncements, developed over a five year period, dealt extensively with the northern goshawk, as the Mexican spotted owl became a concern later in the process. Notably absent, however, from the original documents and projected plans, was extensive discussion of potential management of grazing ungulates. With the exception of a small discussion in relation to goshawk territory, potential management of grazing ungulates was all but ignored.

The USFS published a draft EIS in August 1994. The draft identified four objectives:

1. Standards and guidelines for Mexican spotted owl and northern goshawk are in-

cluded in the Southwest Region's forest plans.

2. Standards and guidelines for old growth are in compliance with requirements for the Mexican spotted owl and northern goshawk and are consistent across the Southwest Region.

3. Standards and guidelines in each Southwest Region forest plan reflect the deemphasis from even-aged management silviculture.

4. Standards and guidelines in each Southwest Region forest plan reflect the deemphasis of timber production from slopes over 40%.

No objective addressed grazing management. The draft EIS only briefly discussed grazing management in the context of alternative plans, and the proposal only suggested site-specific grazing management in goshawk nesting home ranges.

In March of 1995 the USFS published a revised notice of intent to prepare an EIS. This notice proposed to address the additional considerations created by the listing of the MSO as a threatened species and to add the Kaibab national forest to forest plans. The notice indicated the intent to issue a supplemental EIS to address the new information. On May 15, 1995 the USFS published an additional revised notice of intent. It indicated that there would be no additional draft EIS, and that the revisions would be addressed in the final EIS.

Up until this point, the plan to enact region-wide guidelines for grazing was nonexistent. In fact, the plan to significantly manage grazing ungulates was not revealed prior to the issuance of a Final Environmental Impact Statement ("FEIS"). The USFS released the FEIS some fourteen months after the publication of the draft EIS. The FEIS included grazing standards for both goshawk and MSO territories, and two new objectives were added to the statement of purpose. These objectives were as follows:

5. Standards and guidelines for the MSO are consistent with the MSO recovery plan.

**3.** The northern goshawk is listed as a "sensitive" species, while the Mexican spotted owl is listed as a threatened species under the Endangered Species Act.

6. Standards and guidelines for grazing management are added to all forest plans.

In addition, the preferred alternative, Alternative G, containing extensive grazing management plans for the goshawk and the MSO territory, appeared for the first time. It attempted to address the needs of the MSO and northern goshawk, and stated that the science behind the needs was adopted from two publications. The publications included the "Mexican Spotted Owl Recovery Plan" and "Management Recommendations for the Northern Goshawk in the Southwest United States."

On June 5, 1996 the USFS published the Record of Decision ("ROD"), adopting Alternative G. The Regional Forester noted that only Alternative G was entirely consistent with the MSO recovery plan as stated in the new objectives. The Regional Forester, through his decision to adopt Alternative G, also decided to expand the scope of grazing management beyond that of the draft EIS to include region-wide grazing. In the same decision, the Regional Forester concluded that the addition of these extensive grazing management guidelines was not a significant change from the original plans, did not require a supplemental EIS, and that he was a fully informed decision maker.

Plaintiffs allege that no meaningful opportunity to comment on such plans existed throughout the planning process, and, alleging violations of NEPA and NFMA, they challenge the decision to amend the plans.

## DISCUSSION

### I. LEAVE TO FILE AMICUS–CURIAE BRIEF

■ The court will first consider the soundness of allowing Apache County, a nonparty, to file the declaration of Martin D. Moore, as amicus-curiae, in support of Plaintiffs' Summary Judgment Motion. Defendants oppose the motion because allowing the Moore declaration would amount to consideration of matters outside of the Administrative Record. Plaintiffs respond, arguing that Defendants have submitted extensive material outside of the Administrative Record and that, accordingly, if the court is to consider Defendants' additional material, it should also consider the Apache County's declaration.

■ As a general rule, when reviewing an agency decision the court's review is limited to the administrative record.[4] *Northcoast Environmental Ctr. v. Glickman,* 136 F.3d 660, 665 (9th Cir.1998); *citing Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988) (modified in 867 F.2d 1244). Only limited circumstances justify considering extraneous material. The Ninth Circuit characterized these circumstances in four categories: (1) material necessary to determine whether the agency considered all relevant factors and adequately explained its decision; (2) circumstances where the agency relied on extraneous documents; (3) when the extraneous material is necessary to explain technical terms or complicated subject matter; and (4) where Plaintiffs have shown bad faith by the agency. *Id.*

Although not clear, it appears that the *Northcoast* plaintiffs relied on the second exception, arguing that the agency had considered such documents but the record was incomplete. The documents were offered to evaluate the agency's decision regarding the significance of its action. The *Northcoast* court determined that the district court did not abuse its discretion in striking certain exhibits that it found were extraneous to the administrative record. *Id.* At the same time, however, the court found that "it certainly would have been proper for the court to consider" the exhibits, because the issue in the appeal was "alleged agency inaction." *Id.* The court found that "[a] broader scope of review is necessary because there will generally be little, if any, record to review." *Id.* This conclusion seems logical where an

---

4. In addition, the court will usually review the entire administrative action, in the absence of a clearly informed decision by the parties to limit review to selected sections of the record. In the present case, the parties have opted to present this court with only the sections of the administrative record that they deem relevant. Defendants, however, have provided an entire copy of the 28 volume administrative record to Plaintiffs. Thus, the court is able to determine that the decision to limit review to selected parts of the administrative record was the result of an informed stipulation between the parties, and that, because both parties have access to the full record, neither party is prejudiced by the decision.

agency's decision *not* to act precludes the inclusion of all relevant information in the administrative record.

Part of the dispute at present involves the finding of "no significant impact," a finding which eliminated the need to prepare an EIS or follow full NEPA procedures for instituting new regulations. Under the reasoning of *Northcoast* it seems that the court might reasonably venture outside of the administrative record when conducting its review. However, this conclusion is suspect in light of the vast administrative record presently before this court. Even after determining that the changes in the management guidelines would have no significant impact, the USFS went on to prepare an additional EIS. As a result, the administrative record contains comments, documents, and the like from the entire forest-planning process. The result is a 28 volume administrative record. This record is in contrast to the Ninth Circuit's concern in *Northcoast.*

In *Northcoast* Plaintiffs disputed the agency's decision not to issue an EIS. The agency made this decision after determining that its proposed action "merely represented 'the beginning of a planning process'" and did not constitute a final agency action. *Id.* at 663–65. Thus, unlike the present case, no EIS was ever issued. At present, the parties quarrel over an amendment, and the USFS went on to issue an additional EIS regardless of its finding that the amendment had no significant impact. The record in this matter is well developed. Thus, the policy that would have allowed admission of extraneous information in *Northcoast* would not be furthered by allowing it in the present instance. However, the court concludes that the admission of certain affidavits by Defendants warrants the admission of the Moore declaration for a limited purpose only.

The extraneous affidavits submitted by Defendants may aid the court in analyzing the decision-making process of the USFS. The first exception, noted above, allows the admission of extraneous information where such information aids in determining whether the agency considered all relevant factors and adequately explained its decision. Courts have explained this exception as allowing extraneous submissions "when necessary to explain the agency's action." *Animal Defense Council,* 840 F.2d at 1436. For instance, a court may accept submission where a party alleges that the agency failed to consider, or purposefully ignored, "serious environmental consequences." *National Audubon Society v. United States Forest Service,* 46 F.3d 1437, 1447–48 (9th Cir.), *citing California v. Block,* 690 F.2d 753, 763 (9th Cir.1982).

Defendants submit various affidavits in support of the USFS decision. These affidavits outline the decision-making process, and discuss, in some manner, the consideration of various potential effects of the proposed regulations. Of particular interest is the affidavit of Ronald Senn. Senn testifies that he "reviewed detailed economic information and analyzed the impact of the amendment on the livestock industry." Affidavit of Ronald A. Senn ¶ 2. Attached to the affidavit is a table purporting to represent the amendment's impact on the employment sector. The court accepts these documents only for the limited purpose of considering whether the agency considered all relevant factors and explained its decision. In doing so, the court recognizes that the affidavit opens the door to the consideration of what information was "relevant."

Attached to the Moore Declaration are several documents regarding the importance of grazing in Apache County, and the possible economic consequences of certain management decisions on Apache and other rural counties. This information contradicts the table attached to the Senn affidavit, and it appears that it may be relevant information that Senn could have considered in addition to the table. Thus, the court will also consider the Moore declaration and the exhibits attached thereto. However, all extraneous information is admitted for the limited purpose described above only.[5]

---

**5.** The court is somewhat reluctant to consider any of the above submissions. This reluctance stems, in part, from the fact that the information deals largely with financial concerns stemming from the amendment, rather than environmental concerns. The exception to the rule limiting review to the administrative record appears to be less warranted in such instances, considering that the ultimate goal of NEPA is environmental protection. However, because the documents may prove relevant under NFMA and the Forest

The court will now turn to the dispositive motions pending in this case.

## II. MOTION TO DISMISS

Defendants move to dismiss Plaintiffs' complaint based on lack of standing. Their argument revolves around a prudential concern that may affect standing, rather than a constitutional issue. Namely, Defendants argue that Plaintiffs are not within the "zone of interests" protected by NEPA, and therefore, they lack standing to challenge the actions of USFS taken pursuant to the Act.

### A. The Standard

To bring a claim before an Article III court, Plaintiffs must have standing. A plaintiff is first subject to constitutional limitation on standing. The plaintiff has standing only if he has a personal stake in the outcome, or "injury in fact," and if there is a causal connection between the injury and the challenged action, such that it is redressable by the court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In addition, certain non-constitutional claims may preclude standing, called prudential concerns. Generally, a plaintiff may only bring a claim on behalf of his own interest, *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), his complaint must in some way be unique, i.e., not be a generalized concern better addressed by the legislature, *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 220, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), and the plaintiff must be within the zone of interests protected by the governing law or statute, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Defendants focus their argument on the latter concern: i.e., Defendants argue that Plaintiffs do not fall within the applicable zone of interests protected by NEPA because they claim only economic injury.[6] This requirement, unlike constitutional standing requirements, may be abrogated by Congress. Therefore, the governing statute controls its application.

In the present case, NEPA does not provide for a cause of action. Rather, individuals wishing to challenge actions under NEPA must bring their claim pursuant to the APA. The APA provides a cause of action for those challenging an agency action only where the potential plaintiff has been "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Thus, the APA invokes the prudential limitation that a plaintiff's asserted interest must fall "arguably within the zone of interests" which Congress intended to protect when enacting the statute in question. *Data Processing*, 397 U.S. at 153, 90 S.Ct. 827. The crucial inquiry is then shifted to the relevant statute, in this case NEPA.

The Ninth Circuit Court of Appeals addressed standing under the APA and NEPA in *Nevada Land Action Ass'n v. United States Forest Service*, 8 F.3d 713 (9th Cir. 1993). The plaintiff, Nevada Land Action Association, who asserted a challenge under NEPA was a citizens' organization comprised of those individuals with grazing permits in the forest region affected by certain USFS action. Similar to Plaintiffs in the present

---

Service's regulations, the court concludes that it may reasonably consider the documents without prejudicing Defendants because Defendants have invited their submission.

**6.** Defendants also argue that no Plaintiff has supplied a sufficient affidavit to allow this court or Defendants to conclude that any Plaintiff will suffer an injury-in-fact. Defendants addressed this argument mainly in a footnote to their Reply in support of their Motion to Dismiss and during oral argument. Understandably, the contention seemed to catch Plaintiffs off guard during oral argument, as prior to that point the argument was quite obscure within Defendants' filings, and well overshadowed by Defendant' zone of interests argument. Nonetheless, Plaintiffs contend that they are permit holders whose rights are threatened by the amendment. On the surface this position is likely adequate to establish procedural injury-in-fact. Because Defendants address this argument in a rather vague manner in their Reply, and because the court finds Defendants' zone of interests theory persuasive, the court is satisfied with this contention and will not consider it beyond this point.

In addition, Defendants raised a ripeness challenge just prior to the date set for oral argument on these underlying motions. Upon motion of Defendants, and following a short hearing on the subject, the court allowed additional time to brief the issue. Upon further review, however, Defendants notified the court that they were abandoning their ripeness challenge.

case, the *Nevada Land* plaintiff challenged the USFS's action because the action decreased grazing level and adversely affected their commercial interests. *Id.* at 715. The court determined that "[t]he purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions." *Id.* at 716, *citing Portland Audubon Soc'y v. Hodel*, 866 F.2d 302, 309 (9th Cir.1989). Because the plaintiff lacked any non-commercial interest in challenging the management plan, the court determined that it lacked standing under NEPA. "[A] plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA." *Id.*

Since the Ninth Circuit published its opinion in *Nevada Land*, the United States Supreme Court has had the opportunity to revisit this issue of standing. In *Bennett v. Spear* the court considered whether purely economic harm was sufficient to establish standing when challenging an action taken pursuant to the Endangered Species Act ("ESA") and the APA. 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The court first considered the issue pursuant to the ESA and determined that the private right of action provided by the statute was broad and that Congress intended to open the zone of interests protected by the ESA. In forming this conclusion, the court rejected the argument that the broad purpose of the ESA was to protect the environment, and that this purpose foreclosed suits by those asserting non-environment injury. *Id.* at 1163. The court looked beyond the broad purpose of the ESA, and first focused its attention on one of the pertinent sections of the ESA utilized by the plaintiffs to bring the challenge: the citizen-suit provision contained within the statute. *See id.* at 1162 ("[T]he obvious purpose of the particular provision in question is to encourage enforcement by so-called 'private attorneys general.' ") The section allowed suits by all interested parties, and did not limit such suits to non-economic interests. *See id.* at 1162 n. 2; quoting 16 U.S.C. § 1540(g) ("any person may commence a civil suit on his own behalf . . ."). Thus, the court concluded that Congress intended to eliminate or broaden the zone of interests through the citizen-suit pro-

vision, and that appellant had standing under the ESA provision regardless of the fact that appellant did not assert an environmental injury. *Id.* at 1163.

More important to our present situation, the court also reevaluated the focus for claims brought under the APA. The court determined that the ESA did not provide for judicial review of certain of the plaintiffs' claims. *Id.* at 1167. As to these claims the plaintiffs had to show that they were within the particular zone of interests contemplated by the APA. The APA required the court to focus its inquiry on the substantive provisions of the ESA, rather than the citizen-suit provision. *Id.* In doing so, the court emphasized that the focus must be on the purpose behind the *individual* section under which the cause of action is brought, rather than the *overall* purpose of the statute. *Id.* The court concluded that a provision in the ESA mandating that the agency "use the best scientific and commercial data available" opened the zone of interests to encompass the economic based harm alleged by plaintiffs. The court determined that the purpose of the section included the goal of economic efficiency (by avoiding the haphazard adoption of guidelines). Therefore, the court determined that the plaintiffs had standing under the substantive environment-based statute. *Id.* at 1168.

Plaintiffs contend that *Bennett* implicitly overruled *Nevada Land's* holding that economic injury was insufficient to establish standing under NEPA. Defendants, on the other hand, assert that *Bennett* merely demonstrated that Congress may invoke a provision to broaden the zone of interests, and that the court must direct its attention to such a provision if one exists and if the action is brought pursuant to it. Defendants point out that because NEPA imposes purely procedural requirements, the overarching purpose cannot be detached from the individual provisions; thus, unlike the ESA, no similar provision exists under NEPA to broaden the zone of interests.

Few courts have had the opportunity to revisit the issue of standing under NEPA since the Supreme Court decided *Bennett.* It is somewhat helpful, however, to review

those that have. In *Knaust v. City of Kingston* the district court considered whether the plaintiffs had standing under NEPA. 978 F.Supp. 86 (N.D.N.Y.1997). The *Knaust* court cited *Bennett* and noted that it must look to the purpose of the section of NEPA under which the plaintiffs pursued their claim to determine whether the plaintiffs were within the relevant zone of interests. *Id.* at 90. However, the court still concluded that economic interests were not within the zone of interests protected by NEPA. *Id.* The court reached this conclusion without any specialized analysis regarding the purpose of the relevant section of NEPA (which required the development of an Environmental Impact Statement) and cited a pre-*Bennett* Fifth Circuit opinion which analyzed the purpose of NEPA as a whole. *Id., citing Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 676 (5th Cir.1992). In any event, the *Knaust* court determined that the plaintiffs had standing based on an allegation of environmental injury. *Id.*

The district court in *Wyoming Farm Bureau Federation v. Babbitt* also addressed the issue of standing. 987 F.Supp. 1349 (D.Wyo.1997). The *Farm Bureau* court determined that the plaintiffs lacked standing under NEPA because they alleged only economic harm. In forming this conclusion, the court did not conduct any analysis of the effects of *Bennett*. *Id.* at 1362. However, the court did cite *Bennett* for a general zone-of-interests proposition, *Id.* at 1361, and it determined that plaintiffs had standing under the ESA pursuant to *Bennett*. Thus, it is apparent that the court chose not to address *Bennett* in the context of NEPA because it felt that *Bennett* did not alter existing law. Thus, neither the *Knaust* court nor the *Farm Bureau* court concluded that *Bennett* implicitly overruled the limitation applied in *Nevada Land.*

*Bennett* and *Nevada Land* are distinguishable. *Bennett* dealt with the ESA, a substantive statute, whereas *Nevada Land* dealt with NEPA. However, the *Bennett* court did analyze the zone of interests test under the APA, the same statute allowing claims under NEPA, for claims which it found could not be brought under the citizen-suit provision of the ESA. At the same time, because the APA invokes a standard zone of interests inquiry

and directs its standing requirement to the relevant statute, the relevant zone of interests will vary according to the underlying statute. Thus, the fact that the *Bennett* court determined that appellants had standing under the APA to bring their ESA claims does not necessarily dictate a determination that an economic injury is sufficient to establish standing to bring NEPA claims. The court concludes that if *Bennett* altered *Nevada Land* in any way, it did so merely by altering the manner in which the court will likely reach the same conclusion.

*Bennett* reiterated the proposition that Congress may abrogate prudential limitations on standing. Thus, when interpreting the relevant zone of interests, the Congressional intent is key. *Bennett* requires the court to look to the specific section of the relevant statute to determine the applicable zone of interests protected:

> Whether a plaintiff's interest is "arguably ... protected ... by the statute" within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question (here, species preservation), but by reference to the particular provision of law upon which the plaintiff relies.

117 S.Ct. at 1167.

The court went on to analyze the particular provision under which the *Bennett* plaintiffs brought their claim. "In the claims that we have found not to be covered by the ESA's citizen-suit provision, petitioners allege a violation of § 7 of the ESA ... which requires, *inter alia,* that each agency use the best scientific and commercial data available.'" *Id.* at 1168; *quoting* 16 U.S.C. § 1536(a)(2). This section, concluded the court, not only advanced the overall goal of species preservation, but it also fulfilled an additional objective to "avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Id.* This secondary objective clearly implicated economic concerns, including those concerns raised by the plaintiffs' through their economic-injury based claims. *Id.*

■ Conversely, unlike the ESA, NEPA offers only procedural guidance. *See, e.g.,*

*Laguna Greenbelt, Inc. v. United States Dep't. Of Transp.*, 42 F.3d 517, 523 (9th Cir.1994). That is, NEPA is a procedure created to insure that an agency, while seeking to fulfill some other substantive agency goal (usually pursuant to another statute), considers the impact on the environment. This procedural nature is in stark contrast to a statute, like the ESA, that is designed to dictate substantive results and may require the consideration of additional factors along the way. Congress enacted NEPA solely to provide a procedure to achieve the overall goal of protecting the environment. Thus, each section of NEPA is designed with this goal in mind, and it makes little difference whether the court directs its attention to the purpose of the sections that Plaintiffs allege Defendants violated, or the purpose of NEPA itself. The purpose is one and the same: protection of the environment. This fact is likely what led the district courts in *Knaust* and *Farm Bureau* to rule as they did. Thus, Plaintiffs must allege an environmental harm to have standing under NEPA.

### B. Plaintiffs' Standing

■ Plaintiffs are involved in the ranching industry. They allege that the guidelines threaten their ability to graze domestic ungulates pursuant to properly-obtained permits. The guidelines allegedly threaten, in some circumstances, to eliminate the ability to graze domestic ungulates altogether, as certain grazing limitations are allegedly exceeded by wild ungulates alone. Thus, Plaintiffs' injury is the threat that the guidelines will essentially negate their grazing permits, and negatively affect their business and livelihood. As described in the complaint:

> The enforcement of the new grazing management standards and guidelines is likely to result in the imposition of severe restrictions and limitation on livestock grazing operations through the entire Southwestern Region, adversely impacting rural communities and countries in addition to ranchers holding National Forest grazing allotments.

Complaint ¶ 58.

Plaintiffs' brief demonstrates that their concern is with the livelihood of their ranching business. This injury is purely economic. The threat to the ranching industry is a commercial threat. As discussed above, economic concerns are insufficient to provide standing under NEPA. Because the purpose of the statute, and the provisions within it, is the protection of the environment, Plaintiffs must allege an environmental injury to have standing under NEPA. They have not. Accordingly, Plaintiffs' NEPA claims contained in their complaint must be dismissed for want of standing. However, Plaintiffs based their claims on NFMA and the Forest Service regulations as well.

■ Likely realizing the flaw in their standing under NEPA itself, in addition to asserting an independent claim under the NFMA and Forest Service regulations, Plaintiffs have attempted to assert that they have standing under NEPA through these regulations. These regulations require NEPA compliance and require the forest service to consider all interests, including those that are economic. Essentially, plaintiffs contend that because of this fact, they have standing to pursue their NEPA claims. Although somewhat unclear, plaintiffs seem to argue that these regulations invite their NEPA challenge.

Plaintiffs' attempt to invoke the standards provided within the NFMA and the Forest Service's regulations to establish standing fails. The Ninth Circuit specifically rejected a similar approach in *Nevada Land*. 8 F.3d at 716 n. 2 (plaintiffs cannot bootstrap NEPA claims through NFMA). Moreover, it is apparent that such an attempt, whether based on NFMA or the Forest Service regulations independently, may effectively subvert the purpose behind NEPA. The court, therefore, believes that the Ninth Circuit's reasoning, rejecting an effort to bootstrap NEPA claims, extends to Plaintiffs' current effort. The Ninth Circuits' determination on this issue was not addressed by the Supreme Court in any manner, and thus, it remains the law of this Circuit. Accordingly, Plaintiffs must allege more than an economic or commercial harm to have standing under NEPA.

Therefore, only Plaintiffs' challenge under NFMA (and the accompanying Forest Service regulations) is viable. Nonetheless, the court will address Plaintiffs' claims on their

merits, as it is convinced that they fail in any event.

## III. MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs' motion challenges the public participation process prior to the decision to adopt the forest management standards at issue. Essentially, Plaintiffs argue that the initial notice and scoping documents ignored forage utilization standards, as did the draft EIS, and that the final EIS was inadequate. Plaintiffs argue that extensive grazing management guidelines appear for the first time in the final EIS, that the final EIS introduced two new objectives, and that no alternative, outside of the preferred alternative addressed these objectives. Thus, Plaintiffs contend that no reasonable alternatives were proposed or considered. In addition, Plaintiffs challenge the finding of no significant impact, and argue even if the finding was proper, Defendants failed to comply with the requirements of even a nonsignificant amendment due to the inadequate notice of the proposed amendments and lack of alternatives considered. Finally, Plaintiffs challenge the scientific basis of the amendments. Plaintiffs raised these concerns on appeal from the decision adopting the regulations, and the agency upheld the Regional Forester's decision to adopt the amendments.

### A. The NFMA and NEPA process

The National Forest Management Act, 16 U.S.C. § 1601 *et seq.*, provides the framework for forest planning. NFMA provides substantive guidance, while NEPA provides purely procedural guidance. Under NFMA, the Secretary of Agriculture must "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Under NFMA, the Secretary must develop these plans and appropriate procedures to "provide for multiple use and sustained yield of [forest resources] ... and, in particular include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e). NFMA and the Forest Service's regulations enacted under NFMA, codified at 36 C.F.R. Pt. 219, require the Forest Service to consider both economic and environmental factors when developing the plans. 36 C.F.R. § 219.1(a); *see also Forest Guardians v. Dombeck,* 131 F.3d 1309 (9th Cir.1997). NFMA provides that significant amendments must go through the same extensive process used when enacting the larger LMRP. Nonsignificant amendments require less procedural safeguards. In addition, NFMA requires compliance with NEPA.

NEPA, or the National Environment Policy Act, 42 U.S.C. 4321 *et seq.*, requires agencies to follow certain procedures when analyzing the environmental aspects of their ordinary duties. These procedures ensure that the agency analyzes the probable environmental effects of its actions. NEPA requires that the agency prepare an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also Northwest Envtl. Defense Ctr. v. Bonneville Power Admin.,* 117 F.3d 1520, 1536 (9th Cir.1997) (quoting 42 U.S.C. § 4332(2)(C)). Generally, only environmental concerns need be addressed in determining the impact and evaluating the need for an EIS. Thus, if proposed actions do not have a significant environmental impact, no EIS is necessary. *Cf. City of Richfield v. F.A.A.,* 152 F.3d 905, 906 (8th Cir. 1998) ("It is axiomatic that, if a project will not significantly affect the environment, an agency need not prepare an EIS at all.").

The EIS is "a procedural obligation designed to assure that agencies give proper consideration to the environmental consequences of their actions." *Merrell v. Thomas,* 807 F.2d 776, 777–78 (9th Cir. 1986). The EIS also ensures that the public is informed about the environmental impact of such actions. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

*Friends of Southeast's Future v. Morrison,* 153 F.3d 1059 (9th Cir.1998) (parallel citations omitted).

If it is determined that the action will indeed have a significant environmental impact requiring an EIS, the agency must prepare an EIS. If the amendment is significant

under both NEPA and NFMA, i.e., it is also a significant change from an existing forest plan, the Forest Service must allow for a ninety day public comment period under NFMA before releasing the final EIS and accompanying ROD (two items usually released simultaneously). Comments received during this period must be discussed and incorporated into the final agency decision. This extended process invokes extensive public notification and participation to insure that the ultimate decision to take a particular action is an informed one.

Plaintiffs argue that the Regional Forester's ROD, and the appeal upholding the ROD, failed to take account of the inadequate public participation in adopting the amendments. Thus, they argue the two agency decisions must be set aside.

### B. The Standard of Review

#### 1. *The General Standard*

■ The present matter is a challenge to the Regional Forester's ROD and the agency's decision to affirm that ROD on appeal. Plaintiffs allege various violations of NEPA, NFMA, and the Forest Service's own regulations. Because neither NFMA or NEPA provides for a private right of action, Plaintiffs must bring this claim pursuant to the APA. 5 U.S.C. § 702.

Under the APA, the court cannot substitute its judgment for that of the agency. Rather, review is based on the administrative record (or those parts of the record designated by the parties), and is conducted under a deferential standard. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The court's inquiry must focus on whether the agency decision can be considered arbitrary and capricious. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (overruled on other grounds in *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). This includes an inquiry into whether the agency considered all relevant information in rendering its decision, and whether it followed the procedure required by the law. *See Marble Mountain Audubon Society v. Rice,* 914 F.2d 179, 182 (9th Cir.1990); *Overton Park,* 401

U.S. at 416, 91 S.Ct. 814. Only if the court determines that an agency decision is arbitrary and capricious may it set aside that decision. *See Marsh v. Orego Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). This arbitrary and capricious standard guides the court's inquiry throughout most of the review process. However, in some instances, purely legal questions may warrant a less deferential standard.

#### 2. *Factual v. Legal Distinction*

Certain agency determinations may involve purely legal questions. Of particular concern are those agency determinations involving the initial decision to invoke NEPA, or, in the alternative, issue a finding of no significant impact, and those later decisions not to supplement an EIS. Although the Supreme Court in *Marsh* determined that the appropriate standard of review under NEPA was an arbitrary and capricious standard, it did so only after determining that the agency decision rested upon disputed facts. The *Marsh* court did not express an opinion on the appropriate standard when the question was one that was purely legal in nature.

The Ninth Circuit recognized this apparent distinction in *Marsh* and held that those purely legal questions must be analyzed under a less deferential standard, one of reasonableness. *See Alaska Wilderness Recreation & Tourism v. Morrison,* 67 F.3d 723 (9th Cir.1995). "We find that it makes sense to distinguish the strong level of deference we accord an agency in deciding factual or technical matters from that to be accorded in disputes involving predominantly legal questions." *Id.* Unfortunately, *Alaska Wilderness* provided little, if any, guidance on how to distinguish between the purely factual determinations, like that in *Marsh,* and those purely legal questions. However, in a later Ninth Circuit opinion, the court stated that *threshold* decisions "that certain activities are not subject to NEPA's procedures" must be analyzed under the reasonableness standard. *Northcoast,* 136 F.3d at 666. The *Northcoast* court still relied on the distinction between purely factual and purely legal questions, but it limited this approach.

In *Marsh*, the Supreme Court held that substantive NEPA decisions by an agency are reviewed under the arbitrary and capricious standard. In particular, the Court held that, where an agency had already conducted an environmental assessment, whether the agency need conduct an EIS is reviewed under an arbitrary and capricious standard....

The circuit courts disagree as to March's breath. In *Goos v. I.C.C.*, the Eighth Circuit declined to interpret *Marsh* broadly. 911 F.2d 1283, 1292 (8th Cir.1990). The *Goos* court held that *Marsh* does not control when dealing with the threshold question of NEPA applicability in the first instance. Similarly, in *Sierra Club v. Lujan*, the Tenth Circuit also adopted a narrow interpretation of *Marsh*, finding threshold NEPA determinations governed by the reasonableness standard of review. 949 F.2d 362, 367 (10th Cir.1991). In contrast, the Eleventh Circuit found *Marsh* broadly applicable to agency actions involving NEPA, stating: "[i]n *Marsh v. Oregon Natural Resources Council*, the Supreme Court considered the question of judicial review under NEPA and explicitly rejected the reasonableness standard.... We, therefore, adopt the arbitrary and capricious standard when reviewing agency action in NEPA cases; if the agency action was not arbitrary and capricious; it should not be set aside." *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir.1990)

The Ninth Circuit follows the narrower application of *Marsh* found in *Goos* and *Sierra Club. See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1331 n. 6 (9th Cir.1992) (*Marsh* distinguishable from cases which turn on the legal meaning of "significant" and whether established and uncontested historical facts presented by the administrative record satisfy this standard). We said in *Greenpeace* that Marsh required the application of the "arbitrary and capricious" standard when reviewing factual disputes between an agency and petitioners. 14 F.3d at 1331. However, we declined to resolve the appropriate standard for primarily legal challenges. *Id.* We addressed that issue directly in [*Alaska Wilderness*]....

Here, we have a threshold question of NEPA applicability. The Secretaries have not prepared an EIS or EA for their ... activities, contending that NEPA does not apply. We agree with the district court that this case involves primarily legal issues—whether certain [agency] activities triggered NEPA's procedural requirements—based upon undisputed historical facts. *We hold the less deferential standard of "reasonableness" applies to threshold agency decisions that certain activities are not subject to NEPA's procedures.*

*Northcoast*, 136 F.3d at 666–67 (emphasis added).

▪ Thus, *Northcoast* seems to limit the factual/legal distinction to threshold decisions, and further differentiates between those initial decisions not to invoke the procedures of NEPA where no environmental assessment has been prepared, that is, where the agency determines NEPA is *wholly inapplicable*, and the decisions where an environmental assessment has been prepared and the decision rests on an interpretation of the assessment. The latter apparently remains reviewable under an arbitrary and capricious standard. As a result, this court need not be overly concerned that *Marsh* might not apply. Here the Forest Service prepared both an environmental assessment and an EIS. Moreover, the main issue of significance, pursuant to NEPA, involves a decision not to supplement an EIS. Thus, even though most of the underlying historical facts in this matter are not disputed, the court remains confident that it should proceed under the arbitrary and capricious standard of *Marsh*.[7]

▪ Moreover, the arbitrary and capricious standard is appropriate under NFMA. Thus, the court will also analyze the original determination of significance, made under NFMA, according to an arbitrary and capricious standard.

---

7. In any event, the court is doubtful that the reasonableness standard would lead to a different conclusion.

### 3. Evaluating the EIS

Possibly stemming again from some factual/legal distinction, courts have articulated a slightly different test for use in evaluating the adequacy of an EIS, where such a challenge is brought under NEPA. *Neighbors of Cuddy Mtn. v. United States Forest Service*, 137 F.3d 1372, 1376 (9th Cir.1998). This test is often referred to as the "rule of reason" test. *Id.*

> [I]n reviewing the adequacy of an EIS, this circuit employs a 'rule of reason' that asks whether an EIS contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences....' Under this standard, once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences the review is at an end.

*Oregon Natural Resources Council v. Lowe*, 109 F.3d 521 (9th Cir.1997) (quotes and citations omitted) (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992)).

However, the "rule of reason analysis and the review for an abuse of discretion are essentially the same." *Cuddy Mtn.*, 137 F.3d at 1376. Therefore, the court need not be overly concerned with this distinction, as it has little practical implication.

Having established that the appropriate standard of review in analyzing the decisions in the ROD and agency appeal is the arbitrary and capricious standard, and the appropriate standard in evaluating the EIS itself is the rule of reason, the court may now address the parties' contentions.

### C. Summary of the Parties' Arguments

Plaintiffs argue that the USFS failed to adhere to the public participation process dictated by NEPA during the years prior to the adoption of the standards and guidelines in question. Specifically, Plaintiffs point to the three separate notices of intent issued by the agency, the scoping documents, and the draft EIS. The notices failed to mention any prospective extensive alterations to the grazing standards. Plaintiffs assert that the notices inadequately informed the public of the prospect for region-wide grazing standards or guidelines. Or, more accurately, the Plaintiffs contend that absolutely no notice was provided. Moreover, Plaintiffs insist that because the notices were inadequate the scoping process also did not address the possibility for changes to grazing standards, especially region-wide changes. Plaintiffs also contend that sufficient notice was equally absent from the draft EIS, which also failed to discuss alternatives to such region-wide grazing plans. The statement of purpose and objectives contained in the draft EIS neglected to mention anything involving grazing management. The absence of such a proposal allegedly negated the opportunity for meaningful public review.

Furthermore, Plaintiffs also challenge the final EIS. Although serious grazing management standards were finally disclosed in the preferred alternative, plaintiffs assert that it was too little too late. The alternative containing significant guidelines for grazing management appeared for the first time in the final EIS, as did two additional stated objectives for the amendment. Plaintiffs contend that the grazing consequences were inadequately analyzed and that the EIS contained an inadequate scientific basis for the decision to adopt the preferred alternative. In addition, the final EIS contained two additional goals, and only the preferred alternative addressed both these goals. Thus, claim Plaintiffs, USFS failed to consider reasonable alternatives to its proposed action, and the analysis of those alternatives actually in the EIS was allegedly inadequate. Moreover, the Regional Forester, in the ROD adopted the region-wide grazing standards of the final EIS.

The agency, on appeal, determined that the draft did discuss prospective changes to the grazing standards. In fact, the agency cited particular comments that the USFS received regarding grazing. Essentially, the agency claims that the only real change was expanding the standards to territory outside of the goshawk territory. In addition, presumably in an attempt to cure the notice deficiencies, the Regional Forester provided additional time between the final EIS and the ROD to provide for an additional opportunity to comment on the decision to expand the scope of grazing regulations in the final EIS. Similarly, the agency found that inter-

ested parties would have additional time for comment as part of the implementation process when the guidelines were applied to specific sites. Finally, according to the agency, the lengthy comment period following the release of the final EIS resulted in key changes, including the application of guidelines to only endangered species areas and the allowance for discretion in applying the guidelines to site specific areas. During oral argument, defense counsel was adamant on this point, stating emphatically that "standards and guidelines in the amendment are not binding until there is a new project decision," and that rangers will be given an "abundance of [site-specific] discretion."

Defendants defend the prospective guidelines and the ROD. First, they argue that the Regional Forester correctly held that the amendments were not significant. Moreover, even if they were, the USFS allegedly followed every requirement for significant amendments under NFMA and NEPA. They contend site-specific application of the standards limits the effect of the amendments. The guidelines are not currently binding, and an additional NEPA process will be required when site-specific implementation occurs during "a new project decision" and the guidelines provide for an "abundance of discretion." The Defendants also assert that the changes in the grazing standards (in the ROD and FEIS) were a logical outgrowth of the proposed grazing guidelines contained in the Draft EIS. In addition, the fact that the changes implicated no environmental concerns, only economic concerns, precluded the need to prepare a supplemental Draft EIS. Thus, they urge this court to uphold the agency decision.

### D. Discussion

### 1. FINDING OF NO SIGNIFICANT IMPACT (NFMA)

The Regional Forester evaluated the overall amendment to the Plan and determined that the proposed amendment was not significant as defined by NFMA. The determination of nonsignificance under NFMA varies from the determination under NEPA. While NEPA looks to the effects of the amendment on the environment to determine significance, NFMA is concerned with the degree of change from the existing forest service regulations. That is, the degree that the proposed amendment alters the LRMP already in place. If the amendment is a significant, material change from the LRMP, the agency must go through the same process as it would go through to enact the original LRMP. If the amendment is not significant the agency must still provide sufficient public notice and comply with NEPA.

### a. *Adequacy of Determination*

■ Plaintiffs argue that the size of the affected region, the immediate nature of the amendments, the effect on the ranching industry, and the substance of the amendments show the significant nature of the amendments. Defendants respond that the significance is judged only by how much it changes the original plan and that the relevant factors do not suggest significance.

Both parties cite the guidelines provided to and utilized by the Regional Forester to determine the significance of a proposed amendment, and argue that the guidelines support their respective case. These guidelines, while not binding, recommend that the Regional Forester look to the following: (1) timing; (2) the location and size of the area subject to the change; (3) consistency with the goals of the Southwest Region forest plans; and (4) whether the change is for a specific site or whether it applies to future decisions.

Again, Plaintiffs insist that the large size affected, 19 million acres, shows the significance of the amendments. They also point out that a large number of permit holders are potentially affected by the grazing standards. Moreover, they argue that the amendments are in effect now, and thus, the injury is immediate.

In contrast, Defendants point out that the Regional Forester determined that the amendments would only be in effect for a short period of time prior to revision. He explained this in the ROD, "This amendment occurs late in the life span of the Southwestern Region forest plans.... [P]lan revisions are currently scheduled to start [as early as 1996 for specific forests]." The Regional Forester also determined that the amendments are consistent with the goals of the

Southwest Region forest plans. The ROD contains a thorough discussion of these findings. Moreover, the Regional Forester determined that forage utilization guidelines were not new. In addition, according to Defendants, the large size of the Southwestern Region is less significant in this case where the plan allows for site specific regulation. Along similar lines, Defendants also dispute the immediate nature and have assured the court that the amendments are not effective without further action.

Based on the information before this court, it cannot conclude that this decision was arbitrary and capricious. The Regional Forester's decision was explained on the record and appears sound. When looking only to the issue of grazing, the regulations affect a large portion of land; however, the effect of the regulations on grazing was mitigated slightly in the ROD. The regulations do not appear to be in effect, and the amendment allows for site specific planning. The amendment provides general guidance, and allows for discretion at the more specific site. It appears that the Regional Forester responded appropriately given the goals of the Southwest Region. Although Plaintiffs contend that the Regional Forester's determination that forage utilization guidelines were not new was erroneous, this fact is disputed, and it would not make much difference given the relatively short life span of the proposed amendment and its consistency with existing goals. The decision appears consistent with the NFMA. Accordingly, the court concludes that the amendment was not significant.

### b. Compliance with Requirements for Nonsignficant Amendments

NFMA dictates certain actions even where proposed amendments will have no significant impact on the environment including notice and compliance with NEPA. Importantly, NEPA requires sufficient disclosure so that the community may properly evaluate the impact of the proposed action. See, e.g., Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1150–52 (9th Cir.1998). USFS must also comply with its own regulations by issuing proper notice through publication of a notice of intent in the Federal Register, 36 C.F.R. § 219.6(b), as well as analyzing the impact and allowing meaningful comment on the proposed regulations.

The USFS published three notices of intent. Although Plaintiffs challenge the failure of USFS to include its intent to adopt region-wide grazing standards within the notice, the USFS went further and prepared a draft and a final EIS. These documents discussed alternatives and allowed for public comment and analysis of potential environmental impact beyond that normally contemplated for insignificant changes. This additional comment period also allowed the USFS to address much of the potential controversy that the proposal raised.

Moreover, it is important to note that the overall amendment focuses on more issues than grazing management. The notice provided addressed the entire amendment, and it is not surprising that it did not focus on the potential for region-wide grazing management. The amendment's main focus is timber harvesting, as is the notice's main focus. Extensive grazing management is not the major focus of the amendment. On the other hand, it is true that this management focus was a rather late addition. However, the extended comment period mitigated any potential prejudice created by imperfect notice.

In fact, the process, while not perfect, fulfilled the goals of NEPA and NFMA more than adequately. The USFS provided the public with notice and ample opportunity for comment, including the extensive period following the release of the FEIS. Public comment, as it should, altered the overall result of the planning process. The Regional Forester modified the proposed plans in response to the comments he received. This result shows that the Regional Forester was a fully informed decision maker and the overall goals of the statutes were fulfilled.

For these and the reasons hereinafter noted, the court concludes that the USFS complied not only with the requirements for nonsignificant amendments, but that, even if the amendment was significant, the EIS and accompanying process for significant amendments were also sufficient.

## 2. CHALLENGES TO THE EIS

The core of Plaintiffs' challenge centers around the adequacy of the Draft EIS and Final EIS, particularly for the purpose of inviting sufficient public participation in the enactment process. In analyzing an EIS, the court must keep in mind its key purposes.

> The requirement of an EIS serves two ends. A properly prepared EIS ensures that federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental consequences, and it provides the public with information on the environmental impact of a proposed action and encourages public participation in the development of that information.

*Oregon Environmental Council v. Kunzman*, 817 F.2d 484 (9th Cir.1987). When analyzing an EIS under the rule of reason the court must be convinced that the agency took a hard look at the significant aspects of its decision. *Lowe*, 109 F.3d at 526. As a part of this process the court must examine the EIS and determine whether it "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences," and whether it was the result of "informed decision-making and informed public participation." *Laguna Greenbelt*, 42 F.3d 517; *quoting Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir.1994).

### a. *Decision not to Supplement the Draft EIS*

■ Under certain circumstances an agency may have a duty to supplement an EIS. *See Portland Audubon Soc. v. Babbitt*, 998 F.2d 705 (9th Cir.1993). Supplementation of an EIS is necessary if significant new considerations render the initial EIS inadequate. *See id.* This includes a supplementation of a draft EIS when the draft is insufficient to bring about the necessary public comments due to significant new information or changes to a plan. "[I]n the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack

of significance—of the new information." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851.

Plaintiffs contend that the decision not to prepare a supplemental EIS was arbitrary and capricious because the agency added two new objectives, as well as a new preferred alternative, to the final EIS. Within the new objectives was the goal of addressing grazing issues to deal with the declining species. The new two objectives were addressed by the preferred alternative, which included the expanded grazing standards. Other alternatives apparently did not address the new objectives as well as the new, preferred alternative. Plaintiffs complain that this failure retarded the public participation process.

Conversely, defendants argue that the changes were a logical outgrowth of the draft and amended notice. Therefore, the public was on notice that the USFS might further address grazing through new objectives. As a result, defendants suggest that the additions to the final EIS were insignificant.

Plaintiffs reply:

> The forest service cannot legitimately argue that the ACGA and other interested members of the public should have known that the agency was contemplating the adoption of region-wide standards and guidelines because it proposed guidelines to be applied only in occupied goshawk home ranges, which contain forest-type vegetation and cover only a fraction of the region's National Forests. This is not the open public process mandated by both NEPA and the Forest Service's planning regulations.

Plaintiff's Joint Response and Reply, 17:15–22.

It is true that the draft EIS contained only a limited discussion of grazing management (limited to specific goshawk territory). It is also true, however, that not all changes to an EIS warrant a supplement. Rather, some changes may in fact logically stem from the initial public comment period and do not warrant a supplemental EIS and additional public comment. *Cf. Northwest*, 117 F.3d at 1539 (actions that could reasonably be predicted as "logical outgrowth[s] of the public

comment process" should be "reasonably anticipated").

However, this initial EIS contained little to warn that the USFS might add the additional objective of substantial grazing management, as well as the new focus on the MSO. The only possible alert for the grazing guidelines was the inclusion of grazing management as to goshawk territory only. This limited grazing regulation was in sharp contrast to the entirely new alternative, the preferred alternative, that would appear in the final EIS accompanied by additional objectives. It is unrealistic to suggest that the latter was a predictable outgrowth of the former. The contrast between the consideration of grazing in the draft EIS and the final EIS and ROD likely impaired the opportunity to comment prior to the release of the final EIS. This impairment resulted directly from the decision not to supplement the EIS.

The court concludes that a supplemental EIS was probably warranted under the circumstances; however, it is not convinced that the decision not to prepare a supplement was actually arbitrary or capricious. While it is possible that one could characterize the decision to implement some minor expanded grazing standards as a logical outgrowth of the draft EIS, it is probably unreasonable to suggest that the added objective and the alternative containing *region-wide* grazing was a logical outgrowth of limited site-specific considerations that were not even part of the original objectives in the draft EIS. Thus, some supplementation would have been wise between the draft and the final EIS. This is especially true in light of the fact that the USFS would later rely, in part, on the additional late-added objectives, dealing with MSO management and grazing, that it deemed insignificant to reject the remaining alternatives. That is, only the new alternative, with extensive grazing management, addressed both the new objectives. This was, to some extent, a sea-change. While the economic concerns cited by Plaintiffs might not render the changes significant in and of themselves, the fact that the alleged positive changes to the environment were significant enough to make the other alternatives unattractive, and require the creation of an entirely new alternative, suggests that the

changes might have been environmentally significant.

Conversely, the Regional Forester determined that a supplemental EIS was not needed and assured the public in the ROD that he was an informed decision maker. Such a decision maker is, in large part, the ultimate goal of a supplemental EIS. And, while a supplemental EIS may have proved wise, the court cannot find this determination to be arbitrary or capricious.

First, the Regional Forester relied on certain data suggesting that the effect of the new changes would not be significant economically or otherwise. Moreover, under NEPA, only environmental concerns are important, and Plaintiffs do not rely upon environmental factors. Most importantly, no prejudice resulted from any error that may have occurred. The final EIS allowed extensive additional time for comment, which in turn resulted in additional changes and insured an informed decision. This conclusion is further supported to some extent by the agency's contention that the "standards and guidelines in the amendment are not binding until there is a new project decision." Furthermore, defendants contend that the ROD modified the extensive grazing guidelines in response to additional public comment. Thus, the court is unconvinced that the end result of the decision not to supplement the EIS was prejudicial to the NEPA process. Therefore, it need not set aside the agency decision based on the decision not to issue a supplement to the draft EIS.

b. *Non-disclosure of Region-wide grazing management and the impact on the community.*

 The USFS disclosed the prospect of adopting more extensive grazing standards than those in the draft EIS, but concluded a supplemental EIS was unnecessary. However, allegedly, even the final EIS failed to adequately consider the impact of the proposed amendment on the community. This fact stems from the final EIS' focus on the impact of timber harvesting and other issues, and its apparent ignorance of the impact of the grazing regulations. Thus, the public was allegedly not fully informed about the

potential impacts of the amendment, and was deprived of the opportunity to meaningfully comment on the impacts of the region-wide standards. This downfall obviously hampered the ability of the USFS to explore and respond to the public's reaction to the potential impact of the region-wide grazing regulation. Thus, the agency allegedly could not consider the full impact in the manner intended by NEPA.

Generally, the EIS should inform the public of the probable impact of a proposed action. A failure to provide an appropriate and full discussion of the proposal may render a decision arbitrary and capricious. *See Portland,* 998 F.2d at 706. However, even where there is a "technical violation" of NEPA because of a procedural defect, such as an incomplete discussion of probable effects, the court must "look to the ultimate harm NEPA seeks to prevent: the risk of damage to the environment ...." *Laguna Greenbelt,* 42 F.3d at 527. Unless this ultimate goal is threatened, "relief will not be granted if the decision-maker was otherwise fully informed as to the environmental consequences." *Id.* That is, even if the EIS falls short of an ideal discussion of possible impacts, if the ultimate decision-maker is informed as to the relevant environmental consequences and makes an informed decision, the court will not grant relief. The opportunity for public comment will affect this determination. *Id.*

Both the initial and the final EIS discussed the potential impact of the amendment on the overall community. However, the impact of region wide grazing could not be addressed until the final EIS, as it was a late addition to the process. The final EIS included some discussion on how the grazing would affect the threatened and endangered species targeted by the amendment, as well as a discussion on how the standards would affect the vegetation. However, Plaintiffs are mainly concerned with the USFS's failure to address the impact on the ranching industry and the communities that depend on the industry.

At present, Plaintiffs have only challenged the determination by pointing to economic consequences. They have failed to point to *environmental* consequences that suggest that the amendments were significant and required an EIS. Economic consequences alone need not be part of the relevant inquiry under NEPA. Under NEPA the failure to discuss economic consequences is of little concern. However, the Forest Service's own regulations do require consideration of both economic and environmental concerns throughout the amendment process under NFMA. Nonetheless, any failure to discuss this economic impact appears minor.

The Regional Forester determined that the impact on the ranching industry was minor and of little concern. Plaintiffs' motion and the amicus brief dispute this determination, citing many communities that depend on the industry. Even assuming that this is true, Plaintiffs and Defendants present conflicting evidence on how the amendments will actually affect the permit holders, and Defendant contends that in many instances the effect will be nonexistent or minimal.

Grazing plays only a small role in the overall amendment. In light of the amendment's focus on other areas, the discussion of impacts seems logical. Moreover, the site-specific preference expressed in the ROD permits the allowable use guidelines to be adjusted. This fact makes it difficult to ascertain the economic effect. However, all environmental consequences were discussed thoroughly, as well as the major economic consequences stemming from the amendment—those dealing with timber harvesting. The agency appears to have taken the necessary hard look at the major impacts of the overall amendment. This determination is further supported by additional justification.

The additional opportunity to comment on the final EIS negated much of the negative impact of the failure to include the proposed standards in the draft EIS. The final EIS included the clear objective of adopting a plan for grazing management. This objective alerted the public to the prospect of extensive grazing regulation. In fact, according to defendants the ACGA actually submitted comments following the final EIS (a fact not disputed by plaintiffs), as did other members of the public. These comments alerted the Regional Forester to additional potential impacts, including the eco-

nomic ones of which plaintiffs complain, and led to certain changes reflected in the ROD. In addition, the impact that plaintiffs complain was not addressed by the EIS, the effect on the ranching industry, is purely economic; thus, even assuming that they are correct their concern was ignored, NEPA does not necessarily require that it be addressed.

Moreover, discretion at the site-specific level, and the EIS process at this level will better deal with much of this controversy. Defendants point out that any potential impact is lessened because the amendments allow site-specific adjustment. Not surprisingly, however, Plaintiffs dispute this contention, arguing that the guidelines and standards are in effect and must be complied with. They have presented some evidence showing that forest rangers and others may also believe that the guidelines must be complied with at this point. However, the guidelines themselves allow for limited site-specific assessment and further reevaluation. Defense counsel stated on the record that such site-specific discretion was a part of the regulations. In addition, counsel represented emphatically that the guidelines would not be enforced prior to a new project decision on a specific site. Defendants are bound by these representations. A process must take place, including compliance with NEPA, when each site adopts guidelines under the region forest plan. The agency contends, and the court agrees, that mistakes by individual rangers under the misconception that the guidelines must be followed immediately do not change the overall requirement. The Forest Service has apparently undertaken some effort to clear up this misconception. Moreover, the individual decisions are appealable, allowing an additional recourse if rangers act imprudently.

Given the nature of the guidelines, the fact that site specific discretion exists, and the fact that an additional comment period followed the final EIS, it is reasonable to conclude that environmental impacts were adequately disclosed and discussed. Thus, the court will now address Plaintiffs' contention that the EIS did not contain an adequate discussion of alternatives to the proposed action.

### c. Consideration of Alternatives

■ Part of the public participation process also requires that the agency consider a reasonable number of alternatives in its decision-making process. "The Forest Service is charged to 'rigorously explore and objectively evaluate all reasonable alternatives....'" *Resources Ltd., Inc. v. Robertson,* 35 F.3d 1300, 1306 (9th Cir.1993), *quoting* 40 C.F.R. § 1502.14(a). A "viable but unexamined" alternative may render an EIS inadequate. *Id.* at 1307, *citing Idaho Conservation League v. Mumma,* 956 F.2d 1508 (9th Cir.1992). However, there is no requirement that an EIS discuss a specific or minimum number of alternatives. *Laguna Greenbelt,* 42 F.3d at 524. The EIS need only discuss "in detail all the alternatives that were feasible and briefly discuss[ ] the reasons [unselected alternatives] were eliminated." *Id.* Nor must an EIS discuss an infinite range of alternatives. "The range of alternatives ... need not extend beyond those reasonably related to the purposes of the project." *Id.*

Plaintiffs first argue that USFS failed to consider a number of viable alternatives, including alternatives that adequately addressed grazing. Plaintiffs also argue that the adoption of such region-wide grazing standards rendered the discussion of alternatives contained in the draft and final EIS inadequate. Furthermore, the adoption of two new objectives in the final EIS rendered the remaining, already defective, alternatives, i.e., those other than the new alternative prepared to address the new objectives, obsolete. The court does not agree.

The alternatives themselves considered a wide range of grazing alternatives, ranging from no action, to action specific to the territory of the target species, to extensive grazing standards in the preferred alternative. While the alternatives may not have addressed every conceivable alternative plan, or even region-wide grazing, and the last minute changes were clearly not ideal, the court cannot conclude that the USFS decision was arbitrary due to lack of consideration of alternatives. Rather, the alternatives allowed the USFS to consider a wide range of standards for grazing management and conclude that the region-wide standards were appro-

priate. Thus, it appears that the decision to adopt region-wide grazing was an informed decision, and any technical deficiency in the discussion of alternatives was insignificant.

Moreover, Plaintiffs quarrel only with the apparent lack of alternatives to address grazing. Defendants point out that there is no requirement that an agency exhaustively list numerous alternatives for every single aspect of the amendment. The court agrees that such a requirement would likely exceed the goals of NEPA. Rather, all that is required is a thorough discussion of all reasonable alternatives to the overall plan, so long as the alternatives provided are feasible in light of the goals. The alternatives in the present case were designed to focus on the overall amendment, not grazing specifically. Nonetheless, the alternatives did address grazing. The simple fact that the alternatives did not focus on grazing, and exhaust all imaginable alternatives in this one particular area, does not render them inadequate. Rather the EIS addressed possible alternatives to meet the overall goals of the amendment. The EIS successfully addressed a wide range of possibilities, and focused on those reasonable alternatives to the overall plan. This result is all that is required.

### d. *Credibility/Sufficiency of Scientific Evidence*

When a decision is based on stale or unsound scientific data, the court may determine that the decision was arbitrary or capricious. *See Portland,* 998 F.2d at 706. In analyzing the scientific basis of an agency's decision, it is important to remember that the standard is one of deference. "NEPA does not require us to decide whether an EIS is based on the best scientific methodology available or to resolve disagreements among various experts." *Laguna Greenbelt,* 42 F.3d at 526. Plaintiffs main contention is that the studies relied upon by Defendants in forming their decision to adopt the region-wide grazing standards for the protection of the goshawk and Mexican spotted owl were either faulty or they did not support the adoption of such guidelines.

In particular Plaintiffs criticize a study that developed certain grazing standards, contained in the utilization chart within the EIS and ROD, that were later criticized by other experts including the USFS's own employees. Plaintiffs suggest that the presented evidence supports the view that the standards will not have a positive effect on the goshawk or spotted owl population. Moreover, Plaintiffs point out that another alternative might have better addressed the goals of the USFS.

■ The decision to adopt one study over another is entitled to substantial deference. Here, the Regional Forester supported his decision with adequate scientific data, even though Plaintiffs have presented alternative studies. Conflicting studies do not necessary show an error on the part of the Regional Forester. Moreover, Plaintiffs overestimate the reliance on the allegedly problematic chart. It appears clear in the ROD that the standards adopted from these scientific studies and incorporated into an allowable use chart are for use only in the absence of more relevant specific standards. This fact is a result of Defendants' reaction to the comments and criticism surrounding the final EIS. The ROD adopts a more limited application of the standards and a preference for site-specific guidelines, to be developed in consultation with the United States Fish and Wildlife Service. The current guidelines provide for an "abundance of discretion," and are not binding until new project decisions are made. Furthermore, criticism alone is an insufficient basis to overrule the agency decision. The court determines that, as to this issue, the agency decision was not arbitrary or capricious.

### IV. CONCLUSION

While it is clear that the process invoked by the USFS was not ideal and may have resulted in some notice violations of NEPA and the forest service's own regulations, these violations did not hamper the overall NEPA process. Environmental concerns were explored, and the ultimate decision was an informed one. For this reason and the representations of Defendants' counsel as noted in this order, the court does not conclude that the Regional Forester's decision adopting region-wide grazing management which require further site-specific determinations or the agency's findings on appeal were

arbitrary and capricious. Accordingly, the district court will not disturb the agency decision in this matter.

IT IS ORDERED granting the Motion of Apache County for leave to file declaration as Amicus Curiae (doc. 31).

IT IS FURTHER ORDERED granting Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment (doc. 24). The clerk is ordered to enter judgment and terminate this case.

IT IS FURTHER ORDERED denying Plaintiffs' Motion for Summary Judgment (doc. 11).

IT IS FURTHER ORDERED granting Plaintiffs' Motion to File Exhibit in Response to Defendants' Late–Filed Exhibit (doc. 46).