**NEVADA LAND ACTION
ASSOCIATION, et al.,
Plaintiff–Appellant,**

and

National Wildlife Federation, Intervenor,

v.

**UNITED STATES FOREST SERVICE,
Defendant–Appellee.**

No. 92–15814.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 1, 1993.

Decided Nov. 2, 1993.

W. Hugh O'Riordan, Davis Wright Tremaine, Boise, ID, John E. Marvel, Marvel & Hansen, Elko, NV, for plaintiff-appellant.

David B. Edelson, Natural Resources Defense Counsel, San Francisco, CA, for intervenors.

Robert L. Klarquist, U.S. Dept. of Justice, Washington, DC, for defendant-appellee.

Before: CHOY, D.W. NELSON, and NORRIS, Circuit Judges.

CHOY, Circuit Judge:

In 1986 the U.S. Forest Service ("Service") adopted a Land and Resource Management Plan ("LRMP") for the Toiyabe National Forest. The appellant Nevada Land Action Association ("NLAA") is a citizens' organization comprised of ranchers who have permits to use the forest for livestock grazing. NLAA challenges the LRMP on the grounds that the Service violated the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"), the National Forest Management Act, 16 U.S.C. § 1600 et seq. ("NFMA"), and the Service's regulations promulgated under NFMA. NLAA also argues that the adoption of the LRMP was arbitrary and capricious, and that the Service failed to provide for meaningful public participation in the planning process.

We conclude that NLAA lacks standing to challenge the LRMP under NEPA, and that summary judgment was properly granted to the Service on NLAA's other claims. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part and dismiss in part.

## BACKGROUND

In preparing an LRMP, the Service must follow the procedural requirements of NFMA, and must also prepare an Environmental Impact Statement ("EIS") in accordance with NEPA. The Service began the extensive process of preparing the LRMP in 1979. In 1985 the Service completed a proposed plan and a draft EIS. The proposal was made available to the public, and a notice of availability was published in the Federal Register. The Service also mailed notices to interested parties and published invitations to participate in local newspapers.

The proposed plan set forth two potentially conflicting goals: maintenance of current grazing levels and improvement of rangeland condition. As required by NFMA, the pro-

posed plan included range management standards and guidelines which if adopted would control future management of the forest. The draft EIS analyzed nine different alternatives, and projected grazing output levels for the alternatives, including a "preferred alternative." For the preferred alternative, the draft EIS projected a slight decrease in grazing levels. The draft EIS also noted that preferential consideration would be given to riparian area resources in the event of conflict with other resources. Although the Service actively solicited public input, neither the NLAA nor any of its members commented on the proposed plan. In 1986, the Service adopted the final LRMP, which contains substantially the same standards and guidelines for grazing as the proposed plan.

The NLAA members are now dissatisfied with the LRMP because they believe that its implementation will result in a drastic decrease in grazing levels in the Toiyabe Forest. After exhausting its administrative appeals, NLAA filed suit in district court. The district court ordered a limited remand to the Service, and then granted the Service's motion for summary judgment. NLAA appeals from this order. The National Wildlife Federation and several other environmental organizations have intervened in support of the Service.

## DISCUSSION

### I. Standing under NEPA

A. *Standard of Review*

█ We review the issue of standing de novo. *Ellis v. City of La Mesa,* 990 F.2d 1518, 1523 (9th Cir.1993).

B. *Discussion*

█ The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq., provides that a plaintiff seeking to challenge an agency action must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702 (1988).[1] Thus, in addition to constitutional

---

1. In addition, the APA entitles a "person suffering legal wrong because of agency action ... to judicial review thereof." 5 U.S.C. § 702. A zone of interests test is not necessarily inapplicable to plaintiffs who claim standing under the "legal wrong" prong of APA § 702. *See Clarke v.*

standing requirements, under the APA a plaintiff must assert an interest "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The purpose of the "zone of interests" test is "to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 397 n. 12, 107 S.Ct. 750, 756 n. 12, 93 L.Ed.2d 757 (1987).

Accordingly, in order to challenge the LRMP under NEPA, NLAA must allege that its injury is within the zone of interests protected by NEPA. NEPA was enacted in order "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321 (1988). The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions. *Portland Audubon Soc'y v. Hodel*, 866 F.2d 302, 309 (9th Cir.), *cert. denied*, 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989). Therefore a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA. *See Port of Astoria v. Hodel*, 595 F.2d 467, 475 (9th Cir.1979); *accord Competitive Enter. Inst. v. National Highway Traffic Safety Admin.*, 901 F.2d 107, 123–24 (D.C.Cir.1990); *Churchill Truck Lines, Inc. v. United States*, 533 F.2d 411, 416 (8th Cir.1976); *Clinton Community Hosp. Corp. v. Southern Maryland Medical Ctr.*, 510 F.2d 1037, 1038 (4th Cir.), *cert. denied*, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975).

NLAA admits that the primary injury suffered by its members is economic, but contends that the LRMP also affects the "human environment" of the NLAA members and has therefore caused "lifestyle loss" as well as economic loss. NLAA further argues that its members have an economic interest in maintaining the forest resources and therefore in protecting the environment. However, NLAA does not allege that the increased grazing levels it seeks would benefit the natural environment, and there seems to be substantial evidence to the contrary. NLAA cannot invoke NEPA to prevent "lifestyle loss" when the lifestyle in question is damaging to the environment. Since NLAA's suit is "more likely to frustrate than to further" the objectives of NEPA, *Clarke*, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12, NLAA lacks standing to challenge the LRMP under NEPA.[2]

## II. Review of Summary Judgment

### A. *Standard of Review*

We review the district court's grant of summary judgment de novo to determine whether there are any genuine issues of material fact. *Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1439 (9th Cir.1990). In making this determination, we view the record in the light most favorable to the non-moving party. *Id.* In the context of reviewing a decision of an administrative agency, de novo review means that we "view the case from the same position as the district court." *Marathon Oil Co. v. United States*, 807 F.2d 759, 765 (9th Cir.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987).

A decision of an administrative agency "must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)). In determining whether an action is arbitrary or capricious, we consider "whether the decision

---

*Securities Indus. Ass'n*, 479 U.S. 388, 400–01 n. 16, 107 S.Ct. 750, 757–58 n. 16, 93 L.Ed.2d 757 (1987).

**2.** We reject NLAA's suggestion that standing under NEPA may be derived from standing under NFMA because the two statutes are interconnected. Although a provision of NFMA does require

compliance with NEPA, *see* 16 U.S.C. § 1604(g)(1) (1988), the statutory schemes are entirely separate. The "zone of interests" inquiry would be meaningless if standing under NEPA could be automatically derived from standing under other statutes which refer to NEPA.

was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 823–24. An agency's interpretation of its own regulations controls unless it is " 'plainly erroneous or inconsistent with the regulation[s].' " *Marathon Oil*, 807 F.2d at 765 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).[3]

### B. Compliance with NFMA

#### 1. Range of Alternatives

■ The Service regulations promulgated under NFMA require that in preparing an LRMP, the Service must consider "a broad range of reasonable alternatives" in order to comply with NEPA and "to provide an adequate basis for identifying the alternative that comes nearest to maximizing net public benefits." 36 C.F.R. § 219.12(f) (1992). NLAA argues that the Service did not comply with this requirement because grazing levels under the various alternatives considered did not encompass a sufficiently broad range. The district court rejected this contention because the alternatives covered "a broad spectrum from primarily commercially-oriented uses to primarily wilderness uses."

■ We agree with the district court. The Service considered nine different alternatives and projected the grazing outputs likely to result from these alternative plans. The projected grazing levels ranged from 100,000 AUMs to 91,800 AUMs for the period of 1991–2000.[4] One of the alternatives involved maintaining the then current grazing level of 98,400 AUMs. The alternative eventually adopted had a forecasted grazing output in the middle of the range of alternatives, at 98,100 AUMs for the 1991–2000 period. Since the maximum level of grazing possible

without impairing range productivity was considered to be 101,600 AUMs, the range of alternatives included grazing outputs as close to 100% capacity. The Service was not required to scrutinize alternatives that could not reasonably be considered feasible options. *Cf. Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1522 (9th Cir.1992) (noting that an agency need not consider "alternatives known to be unacceptable at the outset").

NLAA also argues that the Service's consideration of the nine alternatives was insufficient because the grazing levels were predetermined and "hardwired" into the "FOR-PLAN" computer program used to compare the different alternatives. However, according to the Service, the grazing output levels were estimated by range managers familiar with the management standards involved in each of the alternative plans and with the particular allotments of land. NLAA does not cite any authority suggesting that the Service was required to rely on something other than estimations by its own managers. It is enough that there is evidence in the record that the grazing output levels were derived by professional estimation and were not arbitrarily selected. *Cf. Perkins v. Bergland*, 608 F.2d 803, 807 n. 12 (9th Cir.1979) ("To prove that an agency used 'irrational' [scientific] methods ... a contesting party must show that there is virtually no evidence in the record to support the agency's methodology in gathering and evaluating the data."). Since the grazing levels were not arbitrarily imposed, we conclude that the Service considered a sufficiently broad range of alternatives.

#### 2. Documentation of Decision

The Service regulations require that the Service maintain records of the planning process. Title 36 C.F.R. § 219.10(h) provides:

---

3. NLAA contends that we should apply the "substantial evidence" standard to the Service's factual findings. However, this standard applies only when the agency decision involves a rulemaking procedure under 5 U.S.C. § 553 or is based on a "public adjudicatory hearing." *Overton Park*, 401 U.S. at 414, 91 S.Ct. at 822. A hearing held merely to inform the public about a proposed project and to elicit public input is "quasi-legislative" and is not considered an adjudicatory hearing. *See id.* at 414–15, 91 S.Ct. at

822–23. Contrary to NLAA's argument, the fact that the Service must document its decision-making process and elicit public involvement in developing an LRMP does not mean that the adoption of an LRMP is an adjudicatory proceeding subject to the substantial evidence standard.

4. An "AUM" is an "Animal Unit Month," or the amount of forage eaten by a mature cow in one month.

The Forest Supervisor ... shall develop and maintain planning records that document the decisions and activities that result from the process of developing a forest plan. Records that support analytical conclusions made and alternatives considered by the team and approved by the Forest Supervisor throughout the planning process shall be maintained.

36 C.F.R. § 219.10(h) (1992). NLAA contends that the Service failed to adequately document its methodology in calculating the projected grazing outputs. However, the Service did maintain handwritten worksheets reflecting the calculations made. We agree with the Service that section 219.10(h) does not require more detailed documentation of individual decisions made during the lengthy planning process. *See Marathon Oil,* 807 F.2d at 765 (noting that an agency's interpretation of its regulations is generally controlling). NLAA's additional assertion that the Service was specifically required to produce the scientific data and literature it considered is not supported by § 219.10(h) or any other authority cited by NLAA.[5]

### C. *Was the LRMP arbitrary and capricious?*

■ NLAA argues that the adoption of the LRMP was arbitrary and capricious because there is no rational connection between the LRMP's grazing standards and its statement that grazing levels would not be significantly affected. According to NLAA, the operational standards in the LRMP will necessarily result in reduced grazing and are therefore inconsistent with the LRMP's stated goal of avoiding significant reductions in grazing levels.

■ We review the reasonableness of agency action on the basis of the record before the agency at the time of the decision. *See Friends of Endangered Species, Inc. v.*

*Jantzen,* 760 F.2d 976, 983 (9th Cir.1985); *Association of Pacific Fisheries v. EPA,* 615 F.2d 794, 811–12 (9th Cir.1980). Therefore, it is irrelevant whether NLAA is correct in its assertion that the implementation of the LRMP has resulted in grazing reductions much greater than that predicted by the Service.

Although one of the Service's goals expressed in the LRMP was to maintain current grazing levels, the Service was aware that this goal might not be met. The Record of Decision ("ROD") includes a general statement of policy that "[i]t is not in the best public interest to reduce permitted grazing because of [the] need to maintain viable ranching operations." However, the Service also noted in the ROD that one of the LRMP's goals was to improve the condition of rangeland, and that a temporary reduction in grazing levels was expected. The LRMP states that in the event of conflicts between resource uses, the protection of riparian areas would be given "preferential consideration." The ROD also contains an explicit caveat that because of the limitations of its projections and other factors, "[t]here is no assurance that the outputs will actually occur at the projected number."

We conclude that the Service acted rationally in projecting that grazing levels would not significantly decrease under the LRMP. The Service based its projections on professional estimations by experienced personnel familiar with the allotments of land and the range management standards. Moreover, it is clear that maintaining current grazing levels was only one of the goals of the LRMP, and the Service was aware that this goal would conflict with other goals of the plan.[6]

### D. *Public Participation and Notice Requirements*

■ NLAA argues that the Service did not comply with the notice and public partic-

---

**5.** We reject NLAA's suggestion that the record does not adequately document the Service's balancing of environmental concerns with other resource uses. The Record of Decision contains extensive discussion of this issue in its comparison of the various alternatives considered.

**6.** NLAA also argues that the Service should have used the FORPLAN computer system to generate the projected grazing levels. However, as dis-

cussed above, the grazing levels were not arbitrarily set and were based on reasoned judgments of experienced Service personnel. NLAA has not cited any requirement that the grazing levels be generated by the FORPLAN system.

NLAA's additional arguments regarding the alleged misuse of FORPLAN were adequately refuted by the Service.

ipation requirements of NFMA and APA.[7] NFMA requires the following:

> The Secretary shall provide for public participation in the development, review, and revision of land management plans including, but not limited to, making the plans or revisions available to the public at convenient locations ... before final adoption, during which period the Secretary shall publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plans or revisions.

16 U.S.C. § 1604(d) (1988). *See also* 36 C.F.R. § 219.6 (1992) (setting forth more specific procedures for public participation).

NLAA admits that the Service followed the required procedures, but contends that there was no "meaningful public participation" because of the statement in the proposed plan that the preferred alternative would not significantly alter the current grazing levels. According to NLAA, its members decided not to participate in the planning process because they were misled by this statement, and therefore there was no meaningful public participation.

We reject this argument because the public was on notice of all details of the proposed plan, including the standards and management prescriptions which may have since resulted in decreased grazing levels. In its earlier arguments, NLAA suggests that these standards are in fact so "diametrically inconsistent" with the goal of maintaining current grazing levels that the adoption of the LRMP was irrational. If that is the case, the NLAA members should have been able to discern from their own analysis the effect of the proposed plan on grazing levels. Since the Service did not conceal anything from the public or guarantee that its projec-

tions would be accurate, the public was sufficiently informed to be able to participate meaningfully in the planning process.[8]

### E. *Violation of Water Rights*

NLAA makes several arguments stemming from its assertion that its members have acquired vested water rights as a result of their previous use of water on the grazing land. Assuming arguendo that the NLAA members do have vested water rights, we nonetheless reject NLAA's arguments. An LRMP may not be invalidated on the ground that it interferes with vested water rights.

█ NLAA first contends that the Service was required to consider permittees' vested water rights in adopting the LRMP. However, the Service clearly has the right under NFMA to limit the use of water resources in national forests, since the statute directs the Service to manage conflicting uses of forest resources. *See, e.g.*, 16 U.S.C. §§ 1600, 1604(g)(3) (1988). We are unable to find any authority, and NLAA cites none, suggesting that the Service must consider vested water rights in its planning process.[9]

NLAA also makes a Fifth Amendment argument that the LRMP is invalid because its impairment of vested water rights constitutes a taking of property rights without compensation. However, the Fifth Amendment "is designed 'not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.'" *Preseault v. ICC*, 494 U.S. 1, 11, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990) (quoting *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987)). Even if the implementation of the LRMP did effect a taking under the Fifth

---

**7.** We need not decide whether the requirements of the APA are applicable to the development of LRMPs since NLAA concedes that the Service established a "paper record" that all statutory requirements were followed.

**8.** NLAA further argues that the Service failed to comply with 43 U.S.C. § 1752(d), which requires the Service to consult with grazing lessees or permittees before the Service elects to develop or revise an "allotment management plan" for a particular area of land. This statute is distinct

from NFMA, which specifies procedures for plans to manage entire forests. There is no indication that section 1752's procedural requirements should apply to LRMPs adopted under NFMA.

**9.** The statute relied upon by NLAA, 43 U.S.C. § 661, merely establishes that the NLAA members may have protectable rights to the use of water.

**720**

Amendment, NLAA's remedy would be to file a suit seeking compensation. Since NLAA does not allege that it lacks an adequate procedure by which to obtain compensation, its taking claim is premature. *See id.*

Appellant's request for attorney's fees under 28 U.S.C. § 2412(d) is denied.

**DISMISSED** in part, **AFFIRMED** in part.