**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ASHLEY CREEK PHOSPHATE CO.,
          *Plaintiff-Appellant,*

          v.

GALE NORTON, Secretary, United
States Department of the Interior;
NU-WEST INDUSTRIES, INC., dba:
Agrium Conda Phosphate
Operations,
          *Defendants-Appellees.*

No. 04-35640

D.C. No.
CV-03-00499-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
June 7, 2005—Seattle, Washington

Filed August 22, 2005

Before: Warren J. Ferguson, Robert R. Beezer, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Beezer

**COUNSEL**

E. Craig Smay, E. Craig Smay, P.C., Salt Lake City, Utah, for the appellant.

Zach C. Miller, Davis Graham & Stubbs, Denver, Colorado, for the appellees.

Robert C. Grisham, Assistant United States Attorney, Boise, Idaho, for the appellees.

**OPINION**

McKEOWN, Circuit Judge:

The issue we address is whether Ashley Creek Phosphate Company has standing to bring this action under the National Environmental Policy Act ("NEPA"). Ashley Creek has no environmental stake in the phosphate mining project at issue, which is some 250 miles from the phosphate Ashley Creek controls. Indeed, its only interest is an economic one: if the project does not go forward, Ashley Creek speculates that it might become an alternate supplier of phosphate. Because it has shown neither an injury in fact nor an interest within the zone of interests protected by section 102(2)(C) of NEPA,[1] Ashley Creek lacks standing to bring this NEPA challenge.

---

[1] By convention, throughout the opinion we refer to the relevant provision of NEPA as it was enumerated in the original Act, rather than by its

## PROCEDURAL AND FACTUAL BACKGROUND

Agrium Conda Phosphate Operations manufactures phosphate-based fertilizer at the Conda Phosphate Processing Plant ("the Plant") near Soda Springs, Idaho. Agrium historically has obtained phosphate for the Plant from the Rasmussen Ridge Mine, which is about twelve miles from the Plant. With the Rasmussen Ridge Mine nearing depletion, Agrium began exploring alternate sources of phosphate in the late 1990s.

One option that Agrium initially considered was to supply the Plant with phosphate from deposits near Vernal, Utah ("Vernal deposits"). The Vernal deposits are controlled by Ashley Creek, which leases large portions of the deposits from the State of Utah. Agrium contacted Ashley Creek to find out whether it could supply phosphate for the Plant, but after investigating the cost of mining and transporting phosphate from the Vernal deposits, Agrium decided that obtaining phosphate from Ashley Creek was too expensive.

Agrium turned its attention to expanding its existing operations at the Rasmussen Ridge Mine into North Rasmussen Ridge where it had not previously mined. Much of the land on North Rasmussen Ridge is administered by the Bureau of Land Management ("BLM"), which required Agrium to submit a mine and reclamation plan. The BLM determined that an Environmental Impact Statement ("EIS") was necessary to evaluate the potential impact of exposing harmful materials, such as selenium, and possible harm to the Canada Lynx, a species recently listed as "threatened" under the Endangered Species Act. The exposure of selenium and other elements contained in phosphate increases the potential for release of those elements into the water and soil.

current section designation in the United States Code. Section 102 is codified at 42 U.S.C. § 4332.

The BLM prepared a draft EIS that considered three alternatives, including the proposed action—mining at North Rasmussen Ridge—and a no action alternative. In response, Ashley Creek submitted a letter commenting that the draft EIS was deficient because it did not consider as an alternative the possibility of mining the Vernal deposits that Ashley Creek controls. Ashley Creek wrote that the Vernal deposits were not only cost-effective, but were also environmentally superior to the proposed action.

In declining to include mining the Vernal deposits as an alternative in the final EIS, the BLM explained that its responsibility was to respond to the proposed mining expansion on North Rasmussen Ridge, not to compare various phosphate supplies:

> [The BLM's responsibility is to] either approve the plan of operations as proposed, modify the mine plan with alternatives, or disapprove the operation with the No Action Alternative. As such, a comparative analysis of the cost or other environmental factors of mining North Rasmussen Ridge with other viable phosphate reserves is not within the scope of this analysis. The fundamental question to be decided by this NEPA analysis is not how Agrium's Conda Fertilizer Plant will be fed, but if the North Rasmussen Ridge reserve will be mined at this time.

The BLM also observed that Agrium's investigation indicated that the Vernal deposits were not a viable supply of phosphate because Ashley Creek had not developed the reserves, had no mine plan, and lacked a host of other conditions for mining.

Following the issuance of the final EIS, Ashley Creek filed a complaint in the district court alleging that the alternatives analysis in the EIS was deficient because it failed to consider supplying the Plant with phosphate from the Vernal deposits. The district court dismissed the suit for lack of standing, rea-

soning that Ashley Creek's interest was purely economic and economic interests do not fall within the zone of interests protected by NEPA.

## DISCUSSION

To resolve this appeal, we must address the threshold question of standing. The Supreme Court has described standing as being "[i]n essence the question of . . . whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Because Article III of the Constitution limits the role of the judiciary to hearing only "cases" or "controversies," constitutional standing ensures that a plaintiff has sufficient stake in a case to establish a "case" or "controversy." *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551 (1996). Grafted on top of this constitutional backbone are prudential standing requirements consisting of "several judicially self-imposed limits on the exercise of federal jurisdiction." *Id.* (internal quotation marks and citation omitted). Thus, our standing analysis entails an examination of both constitutional and non-constitutional requirements. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004). We review a district court's determination of standing de novo. *Id.* at 1196-97.

## I.  ARTICLE III STANDING

[1] Because Article III standing is based on constitutional limits on the federal courts' power, U.S. Const. art. III § 2, Article III standing requires as an "irreducible minimum," *Brown Group, Inc.*, 517 U.S. at 551, that the plaintiff show (1) an injury in fact that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc.*

*v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000). The injury in fact prong is determinative of this appeal.

The injury Ashley Creek asserts is that the BLM refused to include in the EIS the alternative that Agrium could mine phosphate from Ashley Creek's Vernal deposits. Ashley Creek's alleged injury is a procedural one that, in essence, amounts to a claim that the BLM injured it by failing to comply with NEPA's procedural requirement of considering alternatives. *See* NEPA § 102(2)(C)(iii) (requiring an EIS to consider alternatives to the proposed action).

[2] NEPA is a procedural statute, and thus it is not surprising that procedural injuries frequently suffice for standing in the NEPA context. *See e.g.*, *Citizens for Better Forestry v. United States Dep't of Agric.*, 341 F.3d 961, 970-72, 978 (9th Cir. 2003) (plaintiffs had standing when they alleged procedural injury of deprivation of opportunity to comment on environmental reviews); *see also*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8 (1992) (plaintiff "assuredly can" enforce procedural rights). But a plaintiff asserting a procedural injury does not have standing absent a showing that the "procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Lujan*, 504 U.S. at 573 n.8.[2] A free-floating assertion of a procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact. *See id.* at 572-73 & nn.7-8; *see also City of Sausalito*, 386 F.3d at 1197 (plaintiff alleging a procedural

---

[2]Our analysis of a procedural injury under NEPA typically involves three inquiries: 1) whether the agency violated certain procedural rules, 2) whether those rules protect the plaintiff's concrete interests, and 3) whether it is reasonably probable that the challenged action will threaten the concrete interests. *City of Sausalito*, 386 F.3d at 1197 (citing *Citizens for Better Forestry*, 341 F.3d at 969-70). Because the first inquiry is closely intertwined with the merits of Ashley Creek's case, which we cannot decide unless Ashley Creek has standing, we focus on the second question.

injury must also assert a concrete interest that is threatened by failure to comply with the procedural requirement); *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001) (plaintiff alleging procedural injury must show that the procedures protect a concrete interest).

**[3]** For claims brought under NEPA, "we have described this 'concrete interest' test as requiring a 'geographic nexus' between the individual asserting the claim and the location suffering an environmental impact." *Cantrell*, 241 F.3d at 679 (citing *Douglas County v. Babbitt*, 48 F.3d 1495, 1500 n.5 (9th Cir. 1995)). Accordingly, plaintiffs who use the area threatened by a proposed action or who own land near the site of a proposed action have little difficulty establishing a concrete interest. *See, e.g.*, *Citizens for Better Forestry*, 341 F.3d at 971 (plaintiffs established geographic nexus by showing that they used and enjoyed national forests affected by proposed national forest management policy); *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1112 (9th Cir. 2002) (plaintiffs with ownership interests in land adjacent to forest affected by proposed action established geographic nexus).

**[4]** Ashley Creek, whose phosphate leases are in Utah, lacks any judicially recognizable geographic nexus to the area that would be affected by mining on the North Rasmussen Ridge, which is approximately 250 miles away in Idaho. Although 250 miles is not some magic numerical distance beyond which a party is too far removed from the immediate environmental impact of a project to assert standing, we observe that this distance prevents an assumption, in this case, that Ashley Creek is geographically connected to North Rasmussen Ridge. Ashley Creek has not shown that its phosphate fields are tied to the location of the proposed mining or that the impacts of the mining will affect its property interests. *Contra Kootenai Tribe of Idaho*, 313 F.3d at 1112 (plaintiffs had ownership interests in lands adjacent to national forests that could be affected by implementation of Forest Service rule). Nor has Ashley Creek alleged that it uses, appreciates,

or in any way has an interest in the region surrounding North Rasmussen Ridge. *Contra Citizens for Better Forestry*, 341 F.3d at 971 (members of plaintiff organization used and enjoyed the forests at issue and, consequently, alleged a concrete interest).

What is missing in this case is a legally sufficient link between Ashley Creeks's interest—getting the BLM to analyze unrelated phosphate deposits 250 miles away from the proposed mines—and NEPA's procedural requirement that agencies analyze the environmental impact of the proposed mining at a specific site, North Rasmussen Ridge. Not only is the geographic link missing, the substantive concrete injury is wholly absent.

Under Ashley Creek's theory, any owner of a phosphate mine, whether located in Alaska, Utah, or Florida, would have standing to challenge the EIS. Why stop there? Taking Ashley Creek's framework one step further, the BLM would be obligated not only to analyze the environmental suitability of unrelated phosphate deposits, but also phosphate substitutes that might be more eco-friendly.

**[5]** Indeed, Ashley Creek is strikingly similar to Justice Scalia's example of the kinds of plaintiffs who cannot assert procedural injuries: "persons who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the [proposed project]." *Lujan*, 504 U.S. at 572 n.7. Without evidence that Ashley Creek's leases have some geographic nexus to the proposed mines, they are for standing purposes "at the other end of the country" from those mines. We therefore hold that the geographic disconnect between Ashley Creek and the proposed mining project at North Rasmussen Ridge precludes Ashley Creek from alleging a procedural injury sufficient to confer standing.

## II.  PRUDENTIAL STANDING

**[6]** Not only does Ashley Creek fail to satisfy the injury in fact component of Article III standing, it fails to meet the

zone of interests test, a prudential standing requirement. The prudential standing analysis examines whether "a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit." *City of Sausalito*, 386 F.3d at 1199. The bottom line is that Ashley Creek's interest in the EIS analysis is purely financial. NEPA, on the other hand, is directed at environmental concerns, not at business interests. For reasons closely related to its lack of a concrete injury, Ashley Creek's challenge does not fall within NEPA's zone of interests. As an alternate basis for our decision, we hold that Ashley Creek lacks standing under the prudential standing requirement.

**[7]** Because NEPA does not provide for a private right of action, *see, e.g.*, *Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir. 1988), plaintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* Under the APA, "a person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has interpreted this section of the APA as imposing a prudential standing requirement that "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).

The zone of interests test is not intended to impose an onerous burden on the plaintiff and "is not meant to be especially demanding." *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). But when, as here, the plaintiff is not "the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

**[8]** We have long described the zone of interests that NEPA protects as being environmental. *See, e.g.*, *Nevada Land Action Ass'n v. United States Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."); *Port of Astoria v. Hodel*, 595 F.2d 467, 475 (9th Cir. 1979) (purely financial interests are outside of NEPA's zone of interests). Accordingly, we have consistently held that purely economic interests do not fall within NEPA's zone of interests: "[A] plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA." *Nevada Land Action Ass'n*, 8 F.3d at 716; *see also Ranchers Cattlemen v. United States Dep't of Agric.*, 2005 WL 1731761 at *18 (9th Cir. July 25, 2005) (an economic injury alone will not support a claim under NEPA); *Western Radio Servs. Co. v. Espy*, 79 F.3d 896, 903 (9th Cir. 1996) (holding that a plaintiff whose only complaint was that agency action would cause economic harm asserted an interest outside NEPA's zone of interests); *Port of Astoria*, 595 F.2d at 475 (holding that injuries that were "only pecuniary losses and frustrated financial expectations that [were] not coupled with environmental considerations" were "outside of NEPA's zone of interests").

**[9]** Under this long-standing rule against purely economic interests falling within NEPA's zone of interests, Ashley Creek fails to establish prudential standing. Rather, Ashley Creek has never claimed to be protecting an interest that is even remotely intertwined with the environment. Ashley Creek's sole interest is in selling phosphate to Agrium; Ashley Creek has not linked its pecuniary interest to the physical environment or to the environmental impacts of the project evaluated in the EIS. As the district court noted, Ashley Creek conceded as much, stating in its brief before that court that it "does not have an interest in the local Idaho environment."

Ashley Creek attempts to escape the conclusion that its bare financial interest falls outside NEPA's zone of interests

by arguing that the rule prohibiting those with purely economic interests from suing under NEPA ceases to apply once an agency decides to move forward with an EIS. Ashley Creek's argument depends on a determination that § 102—the provision of NEPA that sets out the content requirements of the environmental report once an agency determines that an EIS is necessary—protects purely economic interests.[3] That determination, in turn, would require us to conclude that, for purposes of standing, there is a distinction between cases involving NEPA's threshold applicability (i.e., whether an EIS is necessary) and cases in which an EIS is clearly required. In the end, Ashley Creek's theory is undone by the structure of NEPA and the purpose of § 102. Section 102 does not support this bifurcated reading of the statute.

---

[3]Section 102 provides, in pertinent part, that:

> The Congress authorizes and directs that, to the fullest extent possible : (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—
>
> . . .
>
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> > (i) the environmental impact of the proposed action,
> >
> > (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> >
> > (iii) alternatives to the proposed action,
> >
> > (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> >
> > (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Ashley Creek's argument springs from the Supreme Court's decision in *Bennett v. Spear*, 520 U.S. 154 (1997), in which the Court considered the zone of interests protected by a different environmental statute, the Endangered Species Act ("ESA"). The Court clarified that whether a plaintiff's interest is within the zone of interests protected by a statute "is to be determined not by reference to the overall purpose of the Act in question (here, species preservation), but by reference to the particular provision of law upon which the plaintiff relies." *Id.* at 175-76. In *Bennett*, the particular provision at issue was § 7 of the ESA, 16 U.S.C. § 1536, which requires each federal agency to insure that any action it authorizes, funds, or carries out "is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ." 16 U.S.C. § 1536(a)(2). When evaluating potential effects on endangered species, agencies must "use the best scientific and commercial data available." *Id.*

The Court concluded that the language requiring the use of data indicated that one objective of § 7 was to avoid "needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett*, 520 U.S. at 176-77. The purpose of requiring agencies to use high quality data, the Court reasoned, is to "ensure that the ESA not be implemented haphazardly" in ways that cause unnecessary economic harm. *Id.* Because § 7 protected economic interests, the Court held that plaintiffs who asserted economic interests fell within the § 7's zone of interests. *Id.* at 177.

Applying *Bennett*, the Eighth Circuit examined the same provision of NEPA on which Ashley Creek relies, § 102. *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115 (8th Cir. 1999). The court followed *Bennett*'s instruction to examine the particular statutory provision at issue and determined that § 102 encompassed both environmental and economic concerns. *Id.* at 1125-26. The court paid special attention to the regulations that implement § 102,

observing that those regulations require an EIS to include economic effects that are interrelated with physical environmental effects. *Id.* at 1126 (quoting 40 C.F.R. § 1508.14).

The Eighth Circuit rejected an argument that NEPA's general purpose of environmental protection infuses § 102 with that same purpose. *Id.* at 1127. Instead, the court distinguished between cases involving NEPA's applicability and cases where NEPA requires an EIS, and reasoned that the general purpose applies only in threshold applicability cases, but does not govern the specific provisions of NEPA that control the EIS process. *Id.* at 1127. The court concluded that plaintiffs had standing when they claimed that an EIS failed to sufficiently consider the impact of an agency action on local economies. *Id.* at 1126-27.

We agree that *Bennett* instructs us to define the zone of interests with reference to the specific provision of the statute at issue, but we disagree with our sister circuit that § 102 protects purely economic interests or that it can be severed from NEPA's overarching purpose. As Agrium points out, *Friends of the Boundary Waters* is factually distinguishable from this case because the plaintiffs there conducted business on and relied upon the lands that would be affected by the agency action. *Id.* at 1120, 1126. Those plaintiffs also alleged that the agency action would hamper their ability to enjoy the wilderness area involved. *Id.* at 1126. In contrast, Ashley Creek has not alleged any tie to the lands that would be affected by the BLM's decision to permit mining.

We agree that *Friends of the Boundary Waters* can be persuasively distinguished on these factual differences. Nonetheless, we focus on our disagreement with the Eighth Circuit's reasoning because subsequent Eighth Circuit cases have interpreted *Friends of the Boundary Waters* as establishing that "even purely economic interests may confer standing under NEPA if the particular NEPA provision giving rise to the plaintiff's suit evinces a concern for economic consider-

ations." *Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1038 (8th Cir. 2002); *see also Cent. South Dakota Coop. Grazing Dist. v. United States Dep't of Agric.*, 266 F.3d 889, 895-96 (8th Cir. 2001) ("[O]nce [NEPA's] procedures have been invoked, a plaintiff can assert an injury arising from the agency's failure to consider NEPA's particular purposes or provisions, which might include economic considerations."). This reading means that *Friends of the Boundary Waters* has come to stand for a broad principle that extends beyond the facts of that case and would encompass virtually any economic interest, no matter how remote. It is on this open-ended and expansive interpretation of "purely economic interests" that we part company with the Eighth Circuit.

**[10]** An examination of § 102(2)(C) reveals that, while it acknowledges economic concerns, those economic concerns are not divorced from environmental considerations. In other words, § 102(2)(C) does not set out a *purely* economic factor, unconnected to environmental concerns. Section 102(2)(C) requires all federal agencies to:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> > (i) the environmental impact of the proposed action,
> >
> > (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> >
> > (iii) alternatives to the proposed action,
> >
> > (iv) the relationship between local short-term uses of man's environment and the

maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

In interpreting the statute, it is useful to start at the beginning. The EIS itself is triggered by a "major Federal action[ ] that will significantly affect the quality of the human environment." NEPA § 102(2)(C) ("[A]ll agencies of the Federal Government shall . . . include in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement" on the environmental impact of the project). Thus, the human environment is the overarching principle driving the provision.

The statute then goes on to list what an EIS must contain. The first two subsections, §§ 102(2)(C)(i) and (ii), focus specifically on environmental effects—the environmental impact and adverse environmental effects. The third factor simply requires the EIS to contain "alternatives to the proposed action." § 102(2)(C)(iii). The final subsection speaks to commitment of resources. All of these parts of the list are infused with environmental considerations, leaving no room for economic interests divorced from the environment.

[11] While the use of the word "productivity" in subsection (iv) might be construed as requiring agencies to consider economic concerns, that provision requires a statement, not of all economic interests, but rather of the *relationship* between uses of the *environment* and productivity. It does not require a discussion of the impacts on productivity that are not intertwined with the environment. In short, nothing in the text of § 102(2)(C) suggests that an EIS must address an economic concern that is not tethered to the environment.

This conclusion is not surprising given that, for more than a quarter century, courts have understood the purpose of § 102(2)(C) as protecting the environment. *See, e.g.*, *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 143 (1981) (explaining that the "twin aims" of § 102(2)(C) are "to inject environmental considerations into the federal agency's decisionmaking process" and "to inform the public that the agency has considered environmental concerns"); *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979) ("The thrust of § 102(2)(C) is . . . that environmental concerns be integrated into the very process of decisionmaking."). The Supreme Court has counseled that the "theme of § 102 is sounded by the adjective 'environmental,' " which means that NEPA does not require an agency to assess all impacts of a project, only those that have a "reasonably close causal relationship" with "a change in the physical environment." *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772, 774 (1983); *see also Ranchers Cattlemen*, 2005 WL 1731761 at *19 (because plaintiffs failed to allege a connection between the asserted injury and physical environment, the injury fell outside of NEPA's zone of interests).

[12] The regulatory definition of "human environment," which the Eighth Circuit saw as persuasive evidence that § 102(2)(C) protects economic interests, *see Friends of the Boundary Waters*, 164 F.3d at 1125-26 (citing 40 C.F.R. § 1508.14),[4] is consistent with our interpretation. The regulation states that

---

[4]The D.C. Circuit criticized the Eighth Circuit's use of regulations to "extend prudential standing beyond the class of persons Congress intends." *Town of Stratford v. Fed. Aviation Admin.*, 285 F.3d 84, 89 (D.C. Cir. 2002). We need not decide here whether relying on regulations to define the zone of interests is appropriate, but we agree with the D.C. Circuit that courts should not use regulations to expand the zone of interests beyond what Congress intended. Here, we conclude that the statutory text and the regulations are consistent: both permit consideration of economic interests that are *interrelated* with the environmental effects of an action, but neither protects *purely* economic interests. We discuss the regulations only to explain yet another reason why we decline to follow the reasoning of *Friends of the Boundary Waters*.

economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

40 C.F.R. § 1508.14. Although this regulation indicates that economic considerations may be relevant, those economic effects matter only when they are "*interrelated*" with "natural or physical environmental effects." *Id.* (emphasis added). The regulation goes a step further and clarifies that economic effects alone do not require the preparation of an EIS. *Id.* ("Economic . . . effects are not intended by themselves to require preparation of an [EIS]."). Thus, to the extent regulations clarify § 102(2)(C)'s zone of interests, they demonstrate that purely economic considerations are not within that zone. *See also Town of Stratford*, 285 F.3d at 89 (interpreting the regulation as meaning that economic effects are not intended by themselves to require an EIS).

If the text of § 102(2)(C) were not enough to demonstrate that the section does not protect purely economic interests, that conclusion is strengthened by the impossibility of divorcing § 102 from the overall purpose of NEPA. Ashley Creek urges us to conclude otherwise, relying on the statement in *Friends of the Boundary Waters* that

> although . . . the sweeping purposes of NEPA do not, as a threshold matter, bring NEPA's procedures into play unless an environmental injury is at stake, *Bennett* indicates that once those procedures have been invoked, the plaintiffs can assert an injury arising from the agency's failure to take into consideration the particular purposes or provisions of . . . NEPA.

164 F.3d at 1127. The Eighth Circuit apparently perceived that *Bennett*'s directive to consider the particular provision at issue erected a bar that prevented NEPA's general purpose from affecting the zones of interests encompassed by NEPA's individual provisions. We disagree.

The Supreme Court's holding in *Bennett* that the general purpose of the ESA (species preservation) was different than the specific purpose of § 7 of the ESA (preventing needless economic dislocation), *see Bennett*, 520 U.S. at 176-77, does not translate into the conclusion that the general and specific purposes of all statutes are different. The scope of the zone of interests varies according to the provision of law at issue, *id.* at 163, and NEPA and the ESA are different statutes that create different zones of interests. Whereas § 7 of the ESA establishes specific normative requirements, each section of NEPA is a purely procedural one that furthers the general purpose of the statute. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 & 351 n.14 (1989) (contrasting NEPA's procedural requirements with the substantive requirements of § 7 of the ESA). In contrast to the ESA, under which the substantive goals of an individual provision may have a more specific objective than the overarching goal of the statute and may be analyzed independently, § 102 of NEPA cannot be separated from the statute's overarching purpose of environmental protection because it is designed to further that purpose.

The overall purpose of NEPA is to declare a national commitment to protecting and promoting environmental quality. *Id.* at 348; 42 U.S.C. § 4331(a). Each of NEPA's various procedural provisions is designed to further that goal of environmental protection. *Robertson*, 490 U.S. at 348 (stating that to ensure that the commitment to environmental protection is infused into the federal government's actions, NEPA creates, among other 'action-forcing procedures,' the EIS requirement). In short, "[t]he sweeping policy goals [of protecting the environment] announced in § 101 of NEPA are . . . real-

ized through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences." *Id.* at 350 (citation omitted). Because the individual procedural provisions, including § 102(2)(C), are intended to further the overarching goal of NEPA, to safeguard the environment, the provisions cannot be divorced from that broader purpose. Thus, "it makes little difference whether the court directs its attention to the purpose of [§ 102(2)(C)], or the purpose of NEPA itself. The purpose is one and the same: protection of the environment." *Arizona Cattle Growers' Ass'n v. Cartwright*, 29 F. Supp. 2d 1100, 1109 (D. Ariz. 1998).

**[13]** Contrary to Ashley Creek's suggestion, for purposes of determining standing predicated on a purely economic interest, NEPA does not support a distinction between cases involving NEPA's threshold applicability and cases involving evaluation of the EIS process. In light of the purpose of § 102(2)(C)—protection of the environment—and the specific statutory requirements for the content of an EIS, we hold that a purely economic injury that is not intertwined with an environmental interest does not fall within § 102's zone of interests. Having failed to establish either an injury in fact or that its interests are within the zone of interests protected by § 102(2)(C), we affirm the district court's dismissal of Ashley Creek's challenge for lack of standing.

**AFFIRMED.**

---

BEEZER, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the judgment and Part I of the opinion of the court. Because Ashley Creek has failed to establish constitutional standing, I would leave for another day deciding whether the prudential standing doctrine forecloses *any* plaintiff asserting a purely economic injury from bringing suit

under § 102 of NEPA. *Compare Court Op.*, *supra* at 11082 ("The injury in fact prong [of the Article III standing analysis] is determinative of this appeal.") *with Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 39 n.19 (1976) (determination that petitioners lacked constitutional standing rendered consideration of the "zone of interest" test unnecessary).